**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

DALE WASHINGTON ORMAN,
           *Defendant-Appellant.*

No. 06-10398

D.C. No.
CR-05-00403-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
April 18, 2007—San Francisco, California

Filed May 22, 2007

Before: Alfred T. Goodwin, Dorothy W. Nelson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

## COUNSEL

Milagros A. Cisneros, Assistant Federal Public Defender, Phoenix, Arizona, for the appellant.

Michael A. Lee, Special Assistant United States Attorney, Phoenix, Arizona, for the appellee.

## OPINION

CALLAHAN, Circuit Judge:

Dale Washington Orman was convicted of unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), pursuant to a conditional guilty plea. His conviction stems from the seizure of a handgun by an off-duty police officer at a Phoenix mall that prohibits patrons from carrying weapons while on the premises. On appeal he challenges the district court's denial of his motion to suppress the firearm, arguing that he did not consent to the seizure of the gun and that the seizure required reasonable suspicion or probable cause that a crime had been committed. He argues further that neither reasonable suspicion nor probable cause existed and that the search was not justified for officer safety purposes.

## FACTS & PROCEDURAL HISTORY[1]

On August 20, 2004, at approximately 3:45 p.m., Orman and his wife entered the Paradise Valley Mall in Phoenix. An

---

[1]The facts are taken from the district court's order granting in part and denying in part Orman's suppression motion. Officers Ferragamo, Tomasi, Larson and Bernal, mall director Hoskinson, a defense investigator, and Orman testified at the suppression hearing. The district court found the officers' testimony more credible than Orman's and resolved factual disputes in the government's favor.

employee of the local utility company, Arizona Public Service ("APS"), reported to mall personnel that he observed a man (later identified as Orman) place a handgun in his boot before entering the mall. The APS employee described the man as white, wearing a white tank top, and covered with tattoos. He reported that the man entered the southwest area of the mall near Starbucks.

Mall security director Donald Hoskinson received this information by radio, and contacted Officer John Ferragamo of the Phoenix Police Department, who was working at the mall as an off-duty police officer. With the help of another security officer who advised Hoskinson by radio that he had seen the man in question, Officer Ferragamo located Orman near Dillard's department store at the northeast end of the mall. Orman matched the physical description provided by the APS employee.

Officer Ferragamo approached Orman, and from a distance of about six to eight feet asked "excuse me, may I speak to you?" Orman said "sure" and Ferragamo motioned Orman away from the foot traffic and toward a store window. Once away from the flow of foot traffic, Ferragamo told Orman that he had information that Orman may be carrying a gun and asked Orman if that were true. Orman admitted to carrying a gun and apologized. Ferragamo did not see a gun in Orman's boot, but he noticed a small bulge under Orman's shirt and asked Orman where the gun was located. Orman pointed to his waist band and Ferragamo retrieved a 9 mm Glock handgun.[2]

Hoskinson, who was wearing business clothes, did not participate in the encounter. He remained about 20 feet behind and to the left of Ferragamo. Officer Brody Tomasi, who was also working as an off-duty police officer at the mall,

---

[2]Orman testified that he denied having a gun in his boot and never told Ferragamo that he had a gun in his waistband. Instead, he claimed that he was patted down for the gun.

approached the Dillard's area after hearing about the suspected gunman on his radio. He stopped about 10 feet from Ferragamo and Orman, behind and to the left of Orman. He monitored the situation. He did not draw his gun or participate in the contact.

Two other police officers, Roger Larson and Oscar Bernal, entered the mall after being informed by security about a man with a gun. Officer Larson approached Ferragamo and Orman while they were talking by the storefront after Ferragamo had retrieved the handgun. Larson observed the situation as calm and Orman as being cooperative.

Ferragamo then informed Orman that he wanted to continue the conversation in the mall security office.[3] Orman agreed, and he and his wife accompanied Ferragamo and Tomasi to the office. Orman was not handcuffed and was not asked about the gun during the walk. Upon reaching the security office, Ferragamo placed Orman under arrest for carrying a concealed weapon.[4] After completing a records check, Ferragamo read Orman his Miranda rights and questioned him. According to Ferragamo, Orman confirmed his criminal history and explained that the gun belonged to his wife and that he took it into the mall because they did not want to leave it in their open air vehicle.[5]

---

[3]Orman testified that immediately after Ferragamo retrieved the gun, Ferragamo asked him if he had ever "been busted" and done "hard time."

[4]Arizona Revised Statute § 13-3102(A) prohibits the carrying of a concealed weapon without a permit, and possession of a deadly weapon by a prohibited possessor. A convicted felon is both a prohibited possessor and ineligible to obtain a concealed weapons permit. Ariz. Rev. Stat. § 13-3101(A)(6), 13-3112(E)(3).

[5]In contrast, Orman testified that he did not answer any questions for Ferragamo once they arrived in the mall security office and he never told Ferragamo that he and his wife did not want to leave the gun in their vehicle.

Orman was charged in federal court with being a felon in possession of a handgun. He moved to suppress the seizure of the gun and statements made at the scene, arguing that Ferragamo lacked reasonable suspicion to detain him because (1) the APS employee tip was not reliable, and (2) the tip did not establish that Orman was committing a crime because carrying a concealed weapon is authorized under state law. He also argued that the encounter was not consensual and immediately custodial, requiring probable cause and Miranda warnings.

The district court granted the motion in part. It concluded that Ferragamo's conversation with Orman in the mall was consensual. Alternatively, the district court held that Ferragamo had reasonable suspicion to detain Orman. It also held that Orman was not subject to custodial interrogation in the mall. However, the district court concluded that Ferragamo lacked probable cause to arrest Orman because, at the time of arrest, Ferragamo did not know whether Orman had a permit to carry the weapon. The district court recognized that Orman's testimony—regarding Ferragamo asking him in the mall whether he had been busted or done hard time—arguably would establish probable cause for an arrest. However, it rejected Orman's version of the events. Accordingly, the district court ordered the suppression of information obtained from Orman upon his arrest at the security office.[6]

## ANALYSIS

### A.   *Standard of Review*

Motions to suppress are reviewed de novo. *United States v. Meek*, 366 F.3d 705, 711 (9th Cir. 2004). The district court's factual findings are reviewed for clear error. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

---

[6]The district court's conclusion that probable cause did not exist for the arrest was a hollow victory for Orman because no otherwise undiscoverable evidence leading to his conviction was obtained after the arrest.

B. *The Conditions Precedent to a Lawful Protective Search*

As a preliminary matter, we address Orman's contention advanced at oral argument that *Terry v. Ohio*, 392 U.S. 1 (1968), requires that Officer Ferragamo have reasonable suspicion that a crime was being committed before he could lawfully retrieve Orman's gun for officer safety purposes, even if the encounter was consensual.

**[1]** *Terry* held that a brief investigatory detention, while constituting a seizure, is not a violation of the Fourth Amendment provided that the police officer has reasonable suspicion "that criminal activity may be afoot." *Id.* at 30. *Terry* also held that in the course of a lawful investigatory stop, a police officer also may lawfully pat down the detained individual for weapons provided that the officer has reasonable suspicion that the person "may be armed and presently dangerous." *Id.* However, contrary to Orman's assertion, *Terry* did not cabin the use of officer safety patdowns to lawful investigatory detentions.

In *United States v. Flippin*, 924 F.2d 163 (9th Cir. 1991), we rejected an argument similar to the position advanced by Orman. In *Flippin*, two police officers were in a woman's motel room pursuant to her consent. *Id.* at 164. An officer had visited her the previous day to determine the identity of her male companion who had been arrested for possession of drug paraphernalia. *Id.* When she would not produce her identification, the police returned the following day to investigate her identity. *Id.* Her male companion had been released from jail and was also present. *Id.* Upon entering the room, the police patted down the male for weapons. *Id.* When the male and one of the police officers left the room, the female grabbed a makeup bag, held it close to her, and refused to relinquish it. *Id.* The officer forcibly took the bag from her for fear that she was attempting to arm herself. *Id.* Based on the bag's weight, he suspected that it contained a loaded gun. *Id.* He opened the bag and found a gun and cocaine. *Id.*

We explained in *Flippin* that a *Terry* stop-and-frisk "constitutes two independent actions, each requiring separate justifications. The stop must be based on a suspicion of criminal activity and the frisk on a reasonable suspicion that the person is armed." *Id*. at 165 n.2 (citing *United States v. Thomas*, 863 F.3d 622, 628 (9th Cir. 1988)). We also explained that only the frisk portion of *Terry* was implicated in *Flippin* because the police officer's presence in the motel room was consensual. *Id*.

**[2]** The defendant in *Flippin* argued that the constitutional hurdle to entering the motel room—*i.e.*, a search or an arrest warrant or exigent circumstances—must be overcome before the police could undertake a protective weapon's search. We rejected this argument, holding that following a consensual entry, a probable cause predicate is not needed to undertake a weapon's patdown when reasonable suspicion exists that a person is armed. *Id*. at 165-66.

*Flippin* relied on *Maryland v. Buie*, 494 U.S. 325 (1990), which allowed for a protective sweep of a residence for dangerous individuals following execution of an arrest warrant at the residence. In *Buie*, the Supreme Court explained that officer safety both during and after an arrest justifies the necessity of a protective sweep for dangerous persons to protect the officer from harm. *Id*. at 333-34. Therefore, the Court recognized that a protective sweep is not limited to the patdown of lawfully seized individuals. *Id*. at 332-34, 334 n.2 (citing *Michigan v. Long*, 463 U.S. 1032 (1983) (holding the protective sweep of a glove box reasonable under *Terry* when officer had a reasonable belief that the suspect was potentially dangerous), and *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1980) (holding patdown of tavern patron unlawful during execution of warrants to search the premises and arrest the bartender because officer lacked reasonable suspicion that patron was armed and dangerous)).

*Flippin* summarized:

> The protective search was upheld in *Buie* because the police had a legitimate right to enter the home and "[o]nce inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep."

924 F.2d at 165 (quoting *Buie*, 494 U.S. at 334 n.1).

Accordingly, our inquiry is twofold. We must affirm Orman's conviction if we determine that Ferragamo (1) was acting in a lawful situation when he seized the gun from Orman's waistband, and (2) had reasonable suspicion that Orman was armed. *Id*. at 165 n.2, 167. Here, either consent or reasonable suspicion would support the lawfulness of Ferragamo's contact with Orman.

## C.   *The Encounter was Consensual*

**[3]** Orman argues that his contact with Officer Ferragamo in the mall was an immediate seizure within the rubric of the Fourth Amendment because he was not "free to leave." The Supreme Court, however, has held that not all encounters with law enforcement implicate the Fourth Amendment.

In *Florida v. Bostick*, 501 U.S. 429 (1991), the Court examined whether a police encounter on a bus constituted a seizure under the Fourth Amendment. The Court wrote that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id*. at 434. The Court explained: " 'Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.' " *Id*. (quoting *Terry*, 392 U.S. at 19 n.16). *See also Florida v. Royer*, 460 U.S. 491, 497 (1983) (explaining that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public

place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen").

**[4]** The Court explained that the crucial test is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " 501 U.S. at 437 (internal citations omitted). The Court described the reasonable person test as presupposing an innocent person. *Id.* at 438 (citing *Royer*, 460 U.S. at 519 n.4 (Blackmun, J., dissenting)).

Applying *Bostick*'s totality of the circumstances test, we held that an encounter rose to the level of a seizure when three law enforcement officers and a bank investigator met a suspect in his apartment building lobby, the lead agent said to the suspect "let's go into your apartment," and the group followed the suspect up three flights of stairs to his apartment. *Orhorhaghe v. INS*, 38 F.3d 488, 491 (9th Cir. 1994). Our opinion relied on the following considerations: (1) the suspect was faced with "the threatening presence of several officers," (2) the lead agent made it clear to the suspect that he was carrying a weapon, (3) the encounter was in a non-public setting, and (4) the lead agent acted in "an officious and authoritative manner." *Id.* at 494-95.

Relying on *Orhorhaghe*, Orman contends that he was not free to leave because Ferragamo was uniformed and told him to step to the side of the foot traffic in the mall, *i.e.*, away from the public and to a private space. Orman "felt that any exit [he] had was blocked" and "knew [that he] didn't have any question of walking away at the time from that point." Plus, Orman argues that a seizure occurred because Ferragamo did not advise him that he had the right to terminate their encounter.

The district court, however, disagreed with Orman's position. It found that the encounter was "consensual, polite, and

without coercion," that the record does not establish an over-bearing law enforcement presence in the mall, and that a reasonable person would not believe that he was detained or taken into custody during the brief conversation in the mall.

**[5]** We agree with the district court. A reasonable innocent person would not feel that he was being detained by a police officer who politely asked him if he could have a word with him and quickly inquired about a handgun. This case is distinguishable from *Orhorhaghe* because Officer Ferragamo was carrying a radio and never drew his gun. Moreover, Officer Tomasi, who was about 20 feet behind Ferragamo, was not threatening. Additionally, the encounter was brief—lasting three to four minutes—and occurred in a public setting. Finally, the consensual nature of the encounter is not undermined by Ferragamo's failure to expressly tell Orman that he was free to leave. *See INS v. Delgado*, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). Accordingly, we agree with the district court that the encounter was consensual.[7]

D.   *The Gun was Lawfully Seized*

The Supreme Court in *Terry* explained that a search for weapons is justified by the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him," and that "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23. *Terry* also noted that it would be "clearly unreasonable to deny the officer the power to take

---

[7]Because we affirm the district court determination that the encounter was consensual, we do not need to consider its alternate holding that the encounter was supported by reasonable suspicion.

necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24.

**[6]** Pursuant to *Terry*, a search for weapons must be objectively reasonable. The Court framed the inquiry as "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger," *id.* at 27, and repeatedly acknowledged that each case will have to be decided on its own facts. *Id.* at 19, 30. Moreover, in *Adams v. Williams*, 407 U.S. 143, 146 (1972), the Court noted that the purpose of a limited protective search for weapons is to allow a police officer to pursue his work without fear of violence, and explained that the need for a protective search applies regardless of whether carrying a concealed weapon violates any applicable state law.

**[7]** Here Officer Ferragamo's reasonable suspicion that Orman was carrying a gun, which is all that is required for a protective search under *Terry*, quickly rose to a certainty when Orman confirmed that he was carrying a gun. Indeed, the retrieval of the gun was less intrusive than the patdown in *Terry*—Orman pointed to his waistband at which time Ferragamo raised Orman's shirt and retrieved the gun.

**[8]** Officer Ferragamo testified at the suppression hearing that he retrieved the gun for officer safety purposes and that his only concern was that Orman "might have a gun." Although he also testified that Orman "acted perfectly — very cordial," under *Terry* and its progeny a reasonably prudent man in Ferragamo's circumstances would be warranted in retrieving the gun for his safety and the safety of the mall patrons. *Cf. New York v. Quarles*, 467 U.S. 649, 656 (1984) (rejecting argument that public safety exception to the *Miranda* warning should not be recognized based on officer's subjective motivation revealed at suppression hearing).

**[9]** The gun was readily accessible to Orman, who was standing only inches from Ferragamo. *See Pennsylvania v.*

*Mimms*, 434 U.S. 106, 112 (1977) (holding that a *Terry* search was reasonable when a police officer frisked a man stopped for driving with an expired license plate when the man stepped out of the car and the officer noticed a large bulge under his jacket, explaining that "any man of reasonable caution would likely have conducted the pat down") (internal quotation marks omitted); *Ybarra*, 444 U.S. at 93 (describing the *Terry* doctrine as allowing for a patdown for weapons that the officer "reasonably believes or suspects are then in the possession of the person he has accosted"). Furthermore, the mall was crowded and at a minimum, Ferragamo needed to see that the gun was removed from the premises without endangering his safety or the safety of the mall patrons. As in *Terry*,

> the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so.

329 U.S. at 28.

## CONCLUSION

**[10]** We hold that Officer Ferragamo's initial encounter with Orman was consensual and that Ferragamo lawfully seized the gun for safety purposes. The seizure of the gun was not contrary to the Fourth Amendment, and the district court's judgment is **AFFIRMED**.