307 P.3d 82

**STATE of Arizona, Appellee,**

v.

**Johnathon Bernard SERNA, Appellant.**

**No. 1 CA–CR 11–0675.**

Court of Appeals of Arizona, Division 1, Department E.

July 30, 2013.

Thomas C. Horne, Arizona Attorney General By Joseph T. Maziarz, Chief Counsel Criminal Appeals Section and Barbara A. Bailey, Assistant Attorney General, Phoenix, for Appellee.

James J. Haas, Maricopa County Public Defender By Stephen R. Collins, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

THOMPSON, Judge.

¶ 1 Appellant Johnathon Serna (Serna) appeals from his conviction for misconduct involving weapons, a class four felony. The dispositive issue on appeal is whether, in what the superior court found was a consensual encounter, the police officers were entitled to retrieve a weapon from Serna's person. For the following reasons, we affirm.

1. A neighbor testified that Serna was also asked whether he had thrown something away.

2. *See* Arizona Revised Statutes (A.R.S.) section 13–3102(K) (Supp.2012) (officer may take temporary custody of firearm during encounter with citizen).

3. Because the statutes are the same in relevant part as when Serna committed his offense, we cite the current versions.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 On October 25, 2010, at approximately 10:00 p.m., two police officers were in their patrol car driving on North 28th Avenue in Phoenix. Officers described the area as "high crime," a "gang neighborhood" where "violence takes place," and having "numerous drug complaints." The officers saw Serna and a woman standing in the middle of an intersecting street, Garfield. The officers turned their car onto Garfield and after they did so, Serna and the woman separated. The woman walked north; Serna walked south to a friend's house. Officers described this as a common stratagem in the area, as persons disperse to avoid contact with law enforcement inquiries into potential criminality.

¶ 3 The officers stopped their car in front of the house and got out. One of the officers called to Serna to get his attention. Serna turned around and walked toward the officers. Serna was "very cooperative and polite." The officer who called out to Serna asked him if he lived at the house. Serna responded the house belonged to a friend. The officer then observed a bulge on Serna's waistband and asked him if he had any firearms or illegal drugs.[1] Serna said yes. The officer then ordered Serna to place his hands on top of his head and removed a gun from a holster on Serna's waistband.[2]

¶ 4 After the officer removed the gun, the other officer asked Serna if he had ever been incarcerated or had any felony convictions. Serna said he had been convicted of a felony. The two officers then arrested him as a prohibited possessor. *See* Arizona Revised Statutes (A.R.S.) section 13–3102(A) (Supp. 2012).[3] Serna was charged by direct complaint[4] with misconduct involving weapons, a class four felony.

4. "A complaint is a written statement of the essential facts constituting a public offense . . . ." Ariz. R.Crim. P. 2.3(a). The officer's description of the neighborhood as "high crime" with "numerous drug complaints" appears in the factual statement of the complaint. Thus, this information is part of the case record; indeed, it forms part of the charging document. *Cf. infra* ¶ 57 note 14.

¶ 5 Before trial, Serna moved to suppress the gun, asserting it was the "fruit" of an investigatory stop that violated his Fourth Amendment rights because the police did not have reasonable suspicion to believe he was involved in "anything illegal." The state countered that the encounter between Serna and police, including their seizure of his gun, was consensual and the police were entitled to remove his gun for "officer safety" reasons. In additional briefing, Serna also argued that even if his encounter with police was consensual, the police were not entitled to order him to put his hands on his head and to remove his gun because they lacked reasonable suspicion he had been involved in any criminal activity.

¶ 6 The superior court denied Serna's suppression motion. After finding the encounter as described above was consensual ("Given the totality of the circumstances, the encounter … was not so intimidating that a reasonable person would feel he was not free to leave."), and noting the characterization of the area in which the encounter took place ("a 'violent' and 'gang' neighborhood"), the court concluded that after the officers became aware Serna "had a gun, they were allowed to remove the gun and conduct a pat down for safety purposes."

## DISCUSSION

¶ 7 Serna does not take issue with the factual findings made by the superior court, all of which are summarized above. Instead, he argues that even assuming the encounter was consensual, the Fourth Amendment did not allow the police to frisk him for "safety purposes absent reasonable grounds to believe he was involved in criminal activity." The argument Serna raises presents an issue of law; thus our review is de novo. *State v. Moody*, 208 Ariz. 424, 445, ¶ 62, 94 P.3d 1119, 1140 (2004); *State v. Valle*, 196 Ariz. 324, 326, ¶ 6, 996 P.2d 125, 127 (App.2000). We disagree with Serna and hold the court correctly denied his motion to suppress.

¶ 8 The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. Generally, there are three types of encounters between police and individuals, each with different degrees of government intrusion and implications under the Fourth Amendment.

¶ 9 The first is a consensual encounter in which an individual willingly agrees to speak to police officers. An encounter is consensual "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (internal quotes and citation omitted). Such contact may be initiated by the police without any objective level of suspicion. Without more, a consensual encounter does not amount to a seizure under the Fourth Amendment. Thus, officers may question citizens without implicating Fourth Amendment protections "so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437, 111 S.Ct. 2382.

¶ 10 The second type of encounter, based on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), allows police officers who suspect criminal activity to make limited intrusions into an individual's personal security with less than probable cause. Under *Terry*, if an officer has reasonable suspicion a person has committed or is about to commit a crime, the officer may briefly detain the person for investigative purposes. *Id.* at 30, 88 S.Ct. 1868. This limited investigative stop is known as a *Terry* stop. While less demanding than probable cause, the reasonable suspicion required for a *Terry* stop is not a toothless standard: it must be more than an unparticularized suspicion and supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the government intrusion. *Id.* at 21, 88 S.Ct. 1868.

¶ 11 *Terry* also addressed when police may perform a protective search, a limited patdown for weapons called a *Terry* frisk. Although a *Terry* stop and a *Terry* frisk are both seizures under the Fourth Amendment, these seizures have different justifications. A police officer may conduct a *Terry* stop if the officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104

L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868), or if the officer reasonably suspects the person detained committed a crime. *See United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). A *Terry* frisk, however, is allowed for personal safety reasons when an officer is dealing with a person the officer reasonably believes may be armed and dangerous. *Terry,* 392 U.S. at 24, 88 S.Ct. 1868. Although a *Terry* frisk more often than not occurs during a *Terry* stop, nevertheless, the "two types of seizures are analytically distinct." *United States v. Davis,* 202 F.3d 1060, 1062 (8th Cir.2000); *United States v. Orman,* 486 F.3d 1170, 1174 (9th Cir.2007) (*Terry* stop-and-frisk "constitutes two independent actions, each requiring separate justifications") (quoting *United States v. Flippin,* 924 F.2d 163, 165 n. 2 (9th Cir.1991)).

¶ 12 The third type of police-citizen encounter is an arrest—a classic seizure under the Fourth Amendment that must be based on probable cause.

¶ 13 We consider here whether, under the Fourth Amendment it was reasonable for the officers to retrieve the gun from Serna's waistband for officer safety pursuant to *Terry.* Citing *In re Ilono H.,* 210 Ariz. 473, 113 P.3d 696 (App.2005), Serna asserts the police violated his Fourth Amendment rights by retrieving the gun because the officers did not have reasonable suspicion he was involved in any criminal activity. The state counters, as it did in the superior court, with *Orman,* and essentially argues that we should reject *Ilono.*

¶ 14 In *Ilono,* a panel of this court held a police officer was not entitled to conduct a protective search as part of a consensual encounter even if the officer had reasonable grounds to believe the target of the encounter was armed and dangerous in the absence of any reason to believe the target had committed or was committing a crime. *Id.* at 476, ¶ 11, 113 P.3d at 699. The court thus imposed the same justification requirements on a *Terry* frisk as are imposed on a *Terry* stop. However, as discussed *supra,* while a stop and a frisk often occur in conjunction, they are in reality separate actions with distinct purposes that require distinct justifications. *See Flippin,* 924 F.2d at 165 n. 2 ("The stop must be based on a suspicion of criminal activity and the frisk on a reasonable suspicion that the person is armed.").

¶ 15 In *State v. Caraveo,* 222 Ariz. 228, 213 P.3d 377 (App.2009), a different panel of this court suggested it had reservations about *Ilono* ("we need not decide whether we agree with the portion of *Ilono* ... that indicates that an officer who reasonably fears for his or her safety during a consensual encounter is necessarily prohibited from conducting a lawful patdown."). *Id.* at 232, 213 P.3d 377, 213 P.3d at 381. We cited *Orman,* noting that the circuit court had upheld a patdown for officer safety purposes in a "consensual encounter, finding that the officer's 'reasonable suspicion that [the suspect] was carrying a gun ... is all that is required for a protective search under *Terry.*'" *Id.* at 233, 213 P.3d at 382 (quoting *Orman,* 486 F.3d at 1176–77).

¶ 16 That most *Terry* frisks are preceded by *Terry* stops does not make the former dependent on the latter. Consensual encounters can escalate; what begins as a benign conversation between a police officer and an individual can evolve and give rise to a reasonable suspicion that the individual is involved in criminal activity or, even if not involved in such activity, is armed and presently dangerous. We agree that the "danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop" has begun. *Davis,* 202 F.3d at 1063. Thus, we also agree with the court's observation in *Orman* that "*Terry* did not cabin the use of officer safety patdowns to lawful investigatory detentions." *Orman,* 486 F.3d at 1173. We therefore respectfully disagree with the conclusion reached by the panel in *Ilono* that in a consensual encounter, a police officer may not conduct a protective patdown of a person even if the officer has reasonable grounds to believe that person is armed and dangerous unless the officer also has reasonable suspicion the person is involved in criminal activity.[5]

5. But even if we did agree with the conclusion of    the *Ilono* panel, this case is very different from

¶ 17 The Supreme Court stated in *Terry* that "[t]he sole justification of the search in the present situation is the protection of the police officer and others nearby...." *Terry*, 392 U.S. at 29, 88 S.Ct. 1868. Thus, a frisk is allowed because it serves to prevent injury. Requiring an officer to reasonably suspect criminal activity before he may protect himself would hinder the officer's ability to investigate suspicious behavior or even to assist a citizen in apparent need. Without the authority to perform a protective search, an officer in such a situation would be forced to avoid those he reasonably believes are dangerous but not necessarily engaged in criminal conduct. Of course, often an officer does not know that a person may be armed until after he has already initiated the consensual encounter. Without the authority to search a person he reasonably has come to believe is dangerous, the officer in such a situation is in a dilemma. He must then either end the encounter and walk away, requiring him to abandon his legitimate duties and expose himself to potential danger during his retreat, or he may continue the encounter in hopes of acquiring suspicion of criminal activity to justify a frisk, which places him in a dangerous situation without the ability to protect himself. The Supreme Court has cautioned that we should not "require that police officers take unnecessary risks in the performance of their duties." *Id.* at 23, 88 S.Ct. 1868.

¶ 18 In *Orman*, in what was clearly a consensual encounter, a police officer working off-duty for a shopping mall approached the defendant and asked to speak to him. After the defendant said "sure," the officer told the defendant he had information the defendant was carrying a gun and asked if that was true. 486 F.3d at 1172, 1175. The defendant admitted he had a gun and apologized. *Id.* at 1172. The officer noticed a small bulge under the defendant's shirt and asked Orman where the gun was located. *Id.* Orman pointed to his waist band and the officer then retrieved the gun from the defendant. *Id.* The entire encounter was calm and the defendant was cooperative. The court stated that "reasonable suspicion that Orman was carrying a gun, which is all that is required for a protective search under *Terry*, quickly rose to a certainty when Orman confirmed that he was carrying a gun." *Id.* at 1176. Although the officer testified that Orman was perfectly cordial, the court held that a reasonably prudent man in the officer's circumstances would be warranted in retrieving the gun for his safety. *Id.* The court considered the accessibility of the gun to Orman and the fact that he was standing only inches from the officer. *Id.*

■ ¶ 19 We agree with *Orman*'s holding that a protective *Terry* frisk is justified where "a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger," whether arising from a consensual encounter or a *Terry* stop. *Id.* (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). Orman had easy access to the gun and was standing only inches from the officer. *Orman*, 486 F.3d at 1176. In addition, the encounter took place in a busy mall where stray bullets could have serious consequences. *Id.* at 1177. Similarly, Serna was standing very close to the officers and had easy access to his gun. The encounter took place at night in a notoriously dangerous area of Phoenix where officers take great care to ensure their safety.

¶ 20 The Supreme Court's decision in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), is also helpful to our analysis. In *Mimms*, an officer stopped a car for an expired license plate. *Id.* at 107, 98 S.Ct. 330. The officer ordered the driver out of the car. *Id.* After the driver got out of the car, the officer noticed a large bulge under his jacket. *Id.* Because the officer believed the bulge might be a weapon, the officer frisked the driver and found a gun. *Id.* The state conceded "the

---

*Ilono.* There is an obvious distinction between the officer's retrieval of the gun *volunteered* by Serna to be on his person, and the search of Ilono, a minor, which resulted in the discovery and seizure of a beer bottle concealed on his person. While Serna volunteered the informa-

tion that he had a gun and acceded to its retrieval, Ilono concealed evidence of crime on his person which had to be actively seized from him by officers. There is no evidence in this record that officers even touched Serna's person in the course of retrieving the weapon.

officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior." *Id.* at 109, 98 S.Ct. 330. Nonetheless, the Supreme Court said the bulge "permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." [6] *Id.* at 111, 98 S.Ct. 330. The officers here also observed a bulge by Serna's waistband. Rather than simply frisking Serna, as the officers in *Mimms* did, they first asked Serna if he was carrying a gun. When Serna stated he was, their suspicion was now a certainty that Serna was armed with a gun. Seeing the gun in Serna's waistband, under the circumstances, the officers reasonably retrieved it.

¶ 21 "[T]he purpose of a limited protective search for weapons is to allow a police officer to pursue his work without fear of violence." *Orman,* 486 F.3d at 1176 (citing *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)); *see Terry,* 392 U.S. at 23, 88 S.Ct. 1868 (a frisk is based on the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."). As discussed under *Terry,* a search for weapons must be objectively reasonable. The determination of reasonable suspicion is "based on common-sense judgments and inferences about human behavior," *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), and "a reasonable belief based on specific and articulable facts." *Maryland v. Buie,* 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Thus, a frisk is appropriate where a reasonably prudent officer

was aware of facts which would warrant him to believe his safety or that of others was in danger. *Terry,* 392 U.S. at 23, 27, 88 S.Ct. 1868; *United States v. Garcia,* 909 F.2d 389, 391 (9th Cir.1990).

¶ 22 To make this determination, a court is obligated to consider all of the circumstances. *See Terry,* 392 U.S. at 27, 88 S.Ct. 1868. Officers make split-second determinations regarding their safety. The Supreme Court recently reminded us that "judges should be cautious about second-guessing a police officer's assessment, made on the scene of the danger presented by a particular situation." *Ryburn v. Huff,* —— U.S. ——, 132 S.Ct. 987, 991–92, 181 L.Ed.2d 966 (2012). We are not to judge the dangers "[w]ith the benefit of hindsight and calm deliberation," but from the "perspective of a reasonable officer on the scene." *Id.* at 992, 132 S.Ct. 987 (quoting *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

■ ¶ 23 Here, the officers approached Serna at night in a gang-ridden, dangerous, and violent area of Phoenix. After the officers noticed the "bulge" on Serna's right side, they asked Serna if he was armed and, when he admitted he was, had him place his hands on his head [7] and removed a gun from a holster that was secured to Serna's waistband. The officers testified that in dangerous neighborhoods like this one, officers typically do not talk with individuals "when they have a gun on them because it could be hazardous for you."

¶ 24 Considering these circumstances in light of all the case law, especially *Orman* and *Mimms,* we hold that the superior court correctly denied Serna's motion to suppress the gun.[8] This conclusion is consistent with

---

6. The dissent argues that *Mimms* is limited to a traffic stop, which, the dissent posits, is a particularly dangerous type of encounter. The *Mimms* discussion on this point was in the context of an assertion that a traffic stop is less dangerous than other street encounters. We reject the idea that a routine traffic stop is inherently more dangerous than police investigations in other contexts, such as the high-crime neighborhood where this encounter took place.

7. The dissent says this transformed the encounter into a detention. We do not agree that effectuat-

ing the statutorily authorized retrieval of the gun meant that the officers were at that point exercising physical restraint over Serna. In any event, the officer's direction that Serna move his hands so they could temporarily take custody of his gun was reasonable under the circumstances.

8. We do not hold, as the dissent posits, that police may frisk a citizen simply because he is armed. We consider the totality of the circumstances in determining the objective reasonableness of police conduct. Nor, contrary to the dissent's assertion, do we mean to suggest that,

the public policy of the legislature as to how officers should handle interactions with armed persons. The legislature in 2010 amended the misconduct involving weapons statute to state that "[i]f a law enforcement officer contacts a person who is in possession of a firearm, the law enforcement officer may take temporary custody of the firearm for the duration of that contact." A.R.S. § 13-3102(K).[9]

¶ 25 Our holding gives police enough flexibility to react reasonably to whatever situation confronts them while still safeguarding the Fourth Amendment protections of lawfully armed individuals. ¶ 25 We therefore affirm Serna's conviction and sentence.

CONCURRING: DIANE M. JOHNSEN, Judge.

NORRIS, Presiding Judge, Dissenting.

¶ 26 The dispositive issue in this appeal is whether the police violated Serna's Fourth Amendment right to be free from an unreasonable search and seizure when, in what started as a consensual encounter, the police, without suspicion of any criminal activity by Serna or anyone else and without any reason to think he was dangerous, ordered him to place his hands on his head and then removed a gun he was wearing in a belt holster simply because they encountered him at night, in what they described as a bad part of town, and after he had told them he was carrying a gun. The majority says "no."

¶ 27 I respectfully disagree and say "yes" for three separate, but interrelated reasons: first, the majority's answer runs afoul of established Fourth Amendment principles

that bar police in on-the-street encounters—such as what happened here—from doing precisely what they did unless they have reasonable suspicion that criminal activity is "afoot"; second, the majority's answer flies in the face of a state statute that, consistent with these principles, does not authorize police to do what they did here; and third, the majority's answer treats everyone who is armed as being dangerous, an approach to the Fourth Amendment that cannot be squared with what that Amendment stands for.

*I. Fourth Amendment Principles: Consensual Encounters and* Terry *Stops and Frisks*

¶ 28 As relevant here, the Fourth Amendment states the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[10] U.S. Const. amend. IV. This bedrock principle does not mean, however, that police cannot engage individuals in on-the-street casual, consensual encounters. As long as police do not convey in the encounter that the individual must speak with them and is not free to go, the Fourth Amendment is not implicated and police are entitled to interact with the public — to exchange "pleasantries or mutually useful information." *Terry v. Ohio,* 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968); *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991); *see also Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991).

---

absent other circumstances, officers may conduct a *Terry* stop or a *Terry* frisk of any individual they happen to encounter in a high-crime area.

9. The dissent asserts, citing A.R.S. § 13-3102(M)(1), that the applicability of § 13-3102(K) requires an "investigatory stop" based on reasonable suspicion. However, § 13-3102(M)(1) authorizes an officer to temporarily retrieve a firearm from a subject in any "lawful ... criminal investigation." In fact, the statutory definition of "contacted by a law enforcement officer" covers the gamut of police activity, from civil traffic matters, to criminal investigations, to detentions and arrests. This investigation conducted by officers working the dangerous streets

in a criminal milieu, characterized by gang activity and illicit drug trafficking, is clearly a criminal investigation. This is so, even though the contact with Serna was consensual, the dissent's assertion to the contrary notwithstanding. It is especially so if credit is given to the third-party witness's testimony that officers believed Serna had thrown something away in this "high crime residential area with numerous drug complaints."

10. The Fourth Amendment's prohibition against unreasonable searches and seizures is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *State v. Hutton,* 110 Ariz. 339, 341, 519 P.2d 38, 40 (1974).

¶ 29 The Fourth Amendment is implicated, however, when police seize an individual. That point occurs when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. An arrest is the paradigmatic example of a seizure.

¶ 30 A tension exists between an individual's right to be left alone, free from government interference, and the flexibility police need to respond to a variety of situations that present differing levels of risk to themselves and the public. As the Supreme Court explained in *Terry*, the Fourth Amendment cannot be interpreted or applied in such a way as to "exclude the products of legitimate police investigative techniques." *Id.* at 13, 88 S.Ct. at 1875. In *Terry*, the Supreme Court addressed this tension and struck a balance between "legitimate police investigative techniques" and the right of individuals to be free from government interference. The Court held that, without running afoul of the Fourth Amendment, a police officer may temporarily detain, that is, make an investigatory stop of an individual if the officer has reasonable suspicion supported by articulable facts that criminal activity is "afoot" or if police reasonably suspect the person stopped of committing a criminal offense. *Id.* at 21–22, 30, 88 S.Ct. at 1879–80, 1884; *see United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). The Court further held that in such a situation — during the course of what has become known as a *Terry* stop — if the officer has reason to believe the individual is armed and presently dangerous, the officer may conduct a limited search, a patdown, also called a frisk, for weapons. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884–85; *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

¶ 31 The majority notes — correctly so — that consensual encounters can escalate. Police-citizen encounters are dynamic, fluid situations and the line between a consensual encounter and a *Terry* stop and frisk may shift. *See Terry*, 392 U.S. at 13, 88 S.Ct. at 1875–76. The Fourth Amendment, however, requires us to distinguish between the two

because, as discussed, they are analytically distinct. The majority, however, does not do that.

¶ 32 Instead, adopting the approach taken by the superior court in denying Serna's suppression motion, the majority views the entire encounter between the police and Serna — from inception through the officers' removal of his gun — as a consensual encounter. Although I agree the initial police — Serna encounter was consensual, the police officers escalated the encounter into a seizure under the Fourth Amendment when they ordered Serna to put his hands on his head. As one officer acknowledged at the suppression hearing, he "commanded" Serna to put his hands on his head. At that point, Serna was not free to go; he had been seized. *Id.* at 16, 88 S.Ct. at 1877 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (examples of circumstances that "might indicate" seizure under Fourth Amendment include "physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."); *Gentry v. Sevier*, 597 F.3d 838, 844–45 (7th Cir.2010) ("[w]hen the officers pulled up in their patrol car and one officer exited the car and told [defendant] to 'keep [his] hands up,' the officer executed a *Terry* stop"); *United States v. Manzo–Jurado*, 457 F.3d 928, 932 (9th Cir.2006) ("show hands order" was a seizure under *Terry* ).

¶ 33 Accordingly, the issue becomes whether at that point, the police were constitutionally entitled to seize Serna. The answer is "no"; the police had no reasonable suspicion that any criminal activity was "afoot" or that Serna had committed, was committing, or was going to commit a crime. Instead, as the officers acknowledged at the suppression hearing, when they approached Serna, it was just a "routine" inquiry, "kind of a thing [patrol officers] do." The majority fails to address the utter absence of reasonable suspicion and instead reasons the police were entitled to seize Serna and conduct a

"protective search" for his gun because he had told them he was carrying a gun, they had encountered him at night, and in a bad neighborhood.[11] As the majority sees the situation: in a consensual encounter, " 'a protective *Terry* frisk is justified where a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger.' " *See supra* ¶ 19.

¶ 34 Thus, under the majority's approach to the Fourth Amendment, police may turn what starts as a consensual encounter into a *Terry* stop and frisk without the *Terry*-required prerequisite for both — reasonable suspicion of criminal activity. *See also supra* ¶ 17. But, this approach flies in the face of the balance between individual rights and public safety the Supreme Court reached in *Terry*, which the Court reiterated as recently as 2009. In *Arizona v. Johnson,* 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), the Court reaffirmed that for a *Terry* stop and frisk to be constitutionally permissible, two conditions must be met:

> First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Id.* at 326, 129 S.Ct. at 784.

¶ 35 Even before the Supreme Court reaffirmed the prerequisites for a "stop and frisk" in *Johnson,* another panel of this court recognized the Fourth Amendment prohibits police from escalating a consensual encounter into a *Terry* stop and frisk unless they have reasonable suspicion of criminal activity, even if they reasonably believe the target of the encounter is armed and dangerous. In *In re Ilono H.,* 210 Ariz. 473, 113 P.3d 696 (App. 2005), this court applied *Terry* and recognized what the Supreme Court reaffirmed in *Johnson* — that a police officer's right to conduct a frisk must be predicated on the officer's right to initiate the investigatory stop in the first place. *Id.* at 477, ¶ 12, 113

P.3d at 700. To not do so, the court explained, would "contradict" the logic of the Fourth Amendment jurisprudence that recognizes an individual is entitled to be free from government restraint unless reasonably suspected of criminal activity. *Id.* at 477, ¶¶ 12–13, 113 P.3d at 700. Quoting from Justice Harlan's concurring opinion in *Terry,* the *Ilono H.* court explained: "[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop." *Id.* at 476, ¶ 11, 113 P.3d at 699 (emphasis omitted) (quoting *Terry,* 392 U.S. at 32, 88 S.Ct. at 1885 (Harlan, J., concurring)).

¶ 36 The majority rejects *Ilono H.* and, relying on a case decided by the Ninth Circuit Court of Appeals, *United States v. Orman,* 486 F.3d 1170 (9th Cir.2007), justifies its rejection of the reasonable suspicion requirement because the justifications for a *Terry* stop and a *Terry* frisk are different, reasoning "the former [is not] dependent on the latter." *See supra* ¶ 16.

¶ 37 Although I agree the justification for a *Terry* stop is different from the justification for a *Terry* frisk, the two actions are, as discussed above, interrelated; a *Terry* frisk is dependent on the circumstances of the stop. That is what *Terry* and the cases that properly apply it recognize. *See Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to dis-

---

**11.** I address the "bad neighborhood" circumstance *infra* ¶ 57.

cover weapons which might be used to assault him.

¶ 38 Further, the justification for a *Terry* stop — reasonable suspicion of criminal activity — and the justification for a *Terry* frisk — reasonable grounds to believe the person is armed and dangerous — reinforce one another to create meaningful Fourth Amendment standards for determining the legitimacy of police interference with individual liberty in the absence of probable cause to arrest. Allowing police to frisk a person in a consensual encounter without any reasonable suspicion of criminal activity significantly lessens the State's burden of showing the police were entitled to invade a person's right to be left alone which, in my view, is especially important in the context of a consensual encounter.

¶ 39 I then come to the heart of the majority's approach to the Fourth Amendment— that requiring reasonable suspicion before police can frisk a person will hamstring police from doing their "legitimate duties" and put them in harm's way. *See supra* ¶ 17. When phrased in such categorical, stark "it's either this or that" terms, at first blush one would be hard pressed to disagree. But, the reality is not so stark.

¶ 40 First, implicit in the majority's reasoning is the belief that reasonable suspicion of criminal activity and reasonable belief that an individual is armed and dangerous must arise sequentially. That is not necessarily true, however, and *Terry* does not require that. The grounds for a *Terry* stop and a *Terry* frisk can arise simultaneously. As the Supreme Judicial Court of Massachusetts explained in *Commonwealth v. Narcisse*, 457 Mass. 1, 927 N.E.2d 439 (2010):

> [I]t is clear that [reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous] may occur simultaneously. In such cases, a reasonable belief that an individual has a weapon and appears inclined to use it acts to satisfy both prongs of the *Terry* analysis. When an individual appears to be ready to commit violence, either against police officers or bystanders, it is reasonable to believe that he is "about to commit a crime," thus satisfying *Terry*'s first prong. More-

over, the individual's conduct simultaneously gives rise to a reasonable belief that he is armed and dangerous, satisfying the second.

*Id.* at 446 (internal citations omitted).

¶ 41 Second, implicit in the majority's reasoning is a belief that an armed person is a dangerous person, a point discussed in more detail below. *See infra* Part III, ¶¶ 48–53. The conclusion (dangerousness) does not inevitably follow, however, from the predicate (being armed). Indeed, when the police have no reasonable basis to suspect any criminal activity, there is even less of a basis for "a reasonably prudent man in the circumstances [to believe] that his safety or that of others [is] in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

¶ 42 Finally, implicit in the majority's reasoning is the belief that the most important interest at stake here is police safety. The Fourth Amendment does not, however, require police to put themselves in harm's way or ignore threats to their safety. As important as police safety is, the Fourth Amendment secures an equally important interest — the right of the people to be free from unwarranted police interference and restraint. The Supreme Court balanced those interests in *Terry*, and adopted a mechanism — the suppression of evidence taken in violation of the Fourth Amendment — to deter such improper police conduct. As the Court explained, "experience has taught that [the exclusion of evidence seized in violation of the Fourth Amendment] is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.'" *Id.* at 12, 88 S.Ct. at 1875.

¶ 43 In short, I cannot agree with the majority that police may conduct a *Terry* frisk as part of a consensual encounter when all they know is that the target of the frisk is armed. *See infra* ¶¶ 55–56. The record contains no evidence the police reasonably suspected any criminal activity when, after Serna admitted he was carrying a gun, the police ordered him to put his hands on his head and then removed his gun. As I see it, the

majority is carving out an "I have a gun" exception to the Fourth Amendment. As long as a person admits to carrying a gun, police — regardless of the reason why they have encountered the person, and regardless of what the person has or has not done — are entitled to frisk the person for a blanket reason of "officer safety." This is not the limited protective stop and frisk authorized by *Terry*. The Fourth Amendment requires more — reasonable suspicion of criminal activity — and that was utterly lacking here.

## II. A.R.S. § 13-3102 and Public Policy

¶ 44 The majority also says its approach to the Fourth Amendment — which would allow police to conduct a *Terry* stop and frisk without any reasonable suspicion of criminal activity — is consistent with the "public policy of the legislature as to how officers should handle interactions with armed persons." *See supra* ¶ 24 and *supra* ¶ 3 note 2. The majority, however, has misread what the Arizona Legislature did. Instead, the Legislature actually codified *Terry*'s reasonable suspicion requirement for such encounters.

¶ 45 By way of background, in 2010, the Legislature passed, and the Governor signed, Senate Bill 1108 which, with certain exceptions, authorizes Arizona residents and United States citizens to carry a concealed weapon. *See* A.R.S. § 13–3102(A)(2); 2010 Ariz. Sess. Laws, ch. 59, §§ 1–4 (2nd Reg. Sess.). As part of Senate Bill 1108, the Legislature also amended A.R.S. § 13–3102 — the statute that describes the criminal offense of misconduct involving weapons. As amended and as relevant here, a person commits misconduct involving weapons by knowingly car-

rying a deadly weapon and, "[w]hen contacted by a law enforcement officer," failing "to accurately answer the officer if the officer asks whether the person is carrying a concealed deadly weapon." A.R.S. § 13–3102(A)(1)(b). Subsection K of A.R.S. § 13–3102 provides that if "a law enforcement officer contacts a person who is in possession of a firearm, the law enforcement officer may take temporary custody of the firearm for the duration of that contact." Characterizing this subsection as representing the "public policy of the legislature," the majority suggests the Legislature's policy is consistent with its approach to the Fourth Amendment — equating armed with dangerous. *See supra* ¶ 24. But, this is not the case.

¶ 46 The flaw in the majority's reading of subsection K is that under A.R.S. § 13–3102(A)(1)(b), a police officer is not entitled to take possession of a firearm from a person unless the person was first "contacted by a law enforcement officer." "Contacted by a law enforcement officer" means, as defined by the 2010 amendment and as relevant here, "an investigatory stop by a law enforcement officer that is based on reasonable suspicion that an offense has been or is about to be committed." A.R.S. § 13–3102(M)(1).[12] When the relevant provisions of A.R.S. § 13–3102 are read as a whole, a police officer is authorized to take possession of a person's firearm when that person has been "contacted by a law enforcement officer" — a contact that must be "based on reasonable suspicion that an offense has been or is about to be committed."[13]

¶ 47 Accordingly, the "public policy" of this State is consistent with *Terry*.[14] It does not

---

**12.** In full, A.R.S. § 13–3102(M)(1) states that " '[c]ontacted by a law enforcement officer' means a lawful traffic stop or criminal investigation, arrest or detention or an investigatory stop by a law enforcement officer that is based on reasonable suspicion that an offense has been or is about to be committed." The majority appears to suggest that the seizure here can be justified under this provision because the officers were conducting a "criminal investigation." *See supra* ¶ 24 note 9. The problem with this suggestion is that it flies in the face of the facts. The officers were on a routine patrol when they saw Serna; they were not conducting a "criminal investigation," and even they characterized their encounter with Serna as being nothing more than con-

sensual. As one officer stated, "Again, this was a consensual contact."

**13.** The Final Amended Fact Sheet for S.B. 1108, prepared by Senate Research and dated May 4, 2010, explained the legislation "[s]pecifie[d] that if a person in possession of a firearm is contacted by a law enforcement officer, the officer may take temporary custody of the firearm for the duration of the contact."

**14.** Even if A.R.S. § 13–3102(K) could be construed to allow police to conduct a *Terry* stop and frisk without reasonable suspicion of criminal activity, it would be unenforceable under the Fourth Amendment. U.S. Const. art. VI, cl. 2

authorize the police to elevate a consensual encounter into a *Terry* frisk without reasonable suspicion of criminal activity.

### III. Armed and Presently Dangerous

¶ 48 As noted above, the majority justifies its approach to the Fourth Amendment, in part, on the view that being armed equals being dangerous regardless of the circumstances. I reject this equation.

¶ 49 First, the "armed equals dangerous" justification for a protective frisk dispenses with the concept and significance of dangerousness. As recognized by the Idaho Supreme Court in *State v. Henage*, 143 Idaho 655, 152 P.3d 16 (2007), "[a] person can be armed without posing a risk of danger. On the other hand, a person can be dangerous, without apparently being armed. The primary concern of the Supreme Court in *Terry* and its progeny ... was to protect the safety of officers and others from harm when dealing with a person who may pose a risk." *Id.* at 22, 88 S.Ct. 1868.

¶ 50 Second, the "armed equals dangerous" justification makes only one factor—being armed — significant. Yet, *Terry* instructs that when an individual challenges the legality of a frisk, a court is obligated to decide whether the frisk was objectively reasonable by considering all and not just one of the circumstances. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883 ("the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). As I noted above, in a consensual encounter, the absence of reasonable suspicion of criminal activity makes it less likely that a reasonably prudent person under the circumstances would believe he or someone else was in danger. *See supra* ¶ 41. Yet, under the majority's view — that "armed equals dangerous" — dangerousness becomes irrelevant.

¶ 51 Third, the "armed equals dangerous" justification is not supported by the Supreme Court's decision in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), as the majority suggests. *See supra*

¶ 20. In that case, after making a traffic stop, a police officer ordered the defendant out of the car and then noticed a large bulge under the defendant's jacket. *Mimms*, 434 U.S. at 107, 98 S.Ct. at 331. Because the officer believed the bulge might be a weapon, the officer frisked the defendant, and found a gun. *Id.* The Supreme Court found the bulge in the defendant's jacket allowed the officer to reasonably conclude the defendant was armed "and *thus* posed a serious and present danger to the safety of the officer." *Id.* at 111–12, 98 S.Ct. at 334 (emphasis added).

¶ 52 Seizing on the word "thus" in the foregoing quote, the majority reads *Mimms* as authorizing police officers to automatically frisk a person when the only basis for the frisk is the officer's reasonable belief the person is armed. That reading, however, ignores the context for the court's language — a traffic stop. Not only has the Court described that type of encounter as being "especially hazardous," *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983), and "fraught with danger to police officers," *id.* at 1047, 103 S.Ct. at 3480, but the Court has held a traffic stop by itself satisfies *Terry*'s requirement of reasonable suspicion of criminal activity. *See Johnson*, 555 U.S. at 327, 129 S.Ct. at 784 ("[W]e hold that, in a traffic-stop setting, the first *Terry* condition — a lawful investigatory stop — is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity.").

¶ 53 When the encounter is consensual, as it was here, and there is no reasonable suspicion of criminal activity, reasonable belief — indeed, even certainty — that the individual is armed does not, by itself, allow police to assume the individual is dangerous and to then invade that individual's personal security. In my view, *Terry* meant exactly what it said: when an officer has reasonable suspicion of criminal activity, then the officer is entitled to conduct a protective search when,

("This Constitution ... shall be the supreme Law of the Land; and the Judges in every State shall

be bound thereby, any Thing in the ... Laws of any State to the Contrary notwithstanding.").

under all of the circumstances, the officer would be justified in believing the individual is "armed *and presently dangerous* to the officer or to others." 392 U.S. at 24, 88 S.Ct. at 1881 (emphasis added). Admittedly, being armed is an important circumstance within the matrix of circumstances. Contrary to the majority's view, however, that circumstance, by itself, is not enough.

## IV. Totality of the Circumstances

¶ 54 The "central inquiry under the Fourth Amendment" is the "reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878–79. Here, applying de novo review, I conclude the officers were not entitled to seize Serna and then seize his gun. *E.g., State v. Altieri,* 191 Ariz. 1, 2, ¶ 7, 951 P.2d 866, 867 (1997) (appellate court reviews de novo superior court's legal determination as to whether police had reasonable suspicion of criminal activity which justified investigatory stop).

¶ 55 The officers first saw Serna and a woman standing in a street when they decided to approach them. They turned their car and drove towards them. Serna and the woman separated, which is not at all surprising because they were in the street with a car coming towards them. Serna then walked to a friend's house. When the officers approached him, they had no reasonable suspicion that crime was "afoot." They described no evasive action, questionable movement, or suspicious behavior that could justify any reasonable belief Serna, or anyone

else for that matter, had committed or was about to commit a crime.

¶ 56 The officers then called out to Serna. He acknowledged them, walked toward them, and was cooperative and polite. They saw a bulge on the side of his hip, near his waist, and asked him if he was armed. Serna said yes. The officers "commanded" Serna to put his hands on his head and then removed his gun from the belt holster he was wearing around his waist. At no time did Serna do anything to cause the officers to reasonably believe that because of this fact and this fact alone, the circumstances had changed. Indeed, at the suppression hearing, the police described nothing more than a consensual encounter, what one officer described as a "consensual contact" with a person they now knew was carrying a gun.

¶ 57 Now, as part of the circumstances described by the officers at the suppression hearing, they knew Serna was in a bad neighborhood, a gang neighborhood where there had been violence.[15] Serna's presence in a bad neighborhood, however, without more, was not enough to give rise to a reasonable belief he was involved in criminal activity or even posed a present danger to the officers. Let me underscore this point, as the majority puts great store in sanctifying what happened here by emphasizing the officers came across Serna in a bad neighborhood. As recognized by the Supreme Court, although a stop in a "high crime area" is a relevant "contextual consideration" under *Terry,* a person's presence in "an area of expected criminal activity, standing alone, is not enough to support a reasonable, particu-

15. Facts matter here. The majority cites to certain "facts" that are not part of the record made at the suppression hearing. Contrary to what the majority repeatedly says, *see, e.g., supra* ¶ 2, no one testified at the suppression hearing that the area the officers were patrolling when they found Serna was a "high crime" area, with "numerous drug complaints." Thus, not only did the superior court not consider these "facts" when it denied Serna's motion to suppress, but these "facts" are not "facts" we are entitled to consider in reviewing the superior court's ruling. *E.g., State v. Spears,* 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996) ("In reviewing the denial of a motion to suppress, this court looks only at the evidence presented to the trial court during the suppression hearing.").

The majority also relies on other "facts" that are, at best, dubious. First, the majority notes the record contains no evidence the officers "touched Serna's person in the course of retrieving" his gun. *See supra* ¶ 16 note 5. Really— when Serna's gun was in a belt holster on his waistband? Second, the majority notes a neighbor testified at the hearing that she heard the officers asking Serna whether he had thrown something away. *See supra* ¶ 3 note 1 and ¶ 24 note 9. The officers — who were both extensively questioned about what they said to Serna both before and after they seized his gun — never mentioned asking Serna if he had thrown something away.

**528**

larized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000); *see also In re Ilono H.*, 210 Ariz. at 475, ¶ 6, 113 P.3d at 698 (mere presence "in the wrong part of town" does not give officers reasonable cause to conduct investigative stop).[16]

¶ 58 Considering the totality of the circumstances, the officers did not have reasonable suspicion to make a *Terry* stop and most assuredly did not have reasonable grounds to believe Serna, although armed, was dangerous. At the suppression hearing, the officers testified they ordered Serna to put his hands on his head and then seized his gun as a matter of general practice. As one of the officers explained: "given the fact ... it is a dangerous neighborhood, and for officer safety reasons, when you're talking with somebody, you typically don't like to talk to them when they have a gun on them because it could be hazardous for you."

¶ 59 General practice, however, cannot trump the Fourth Amendment.

¶ 60 For the foregoing reasons and on this record, I respectfully disagree with the majority's approach to the Fourth Amendment. The police were not entitled to seize Serna and remove his gun under the Fourth Amendment, and the superior court should have granted Serna's motion to suppress. I would reverse Serna's conviction and remand this matter for further proceedings consistent with suppression of the gun evidence.

---

**16.** The reason why the high crime area circumstance, standing alone, cannot justify a *Terry* stop or frisk should be obvious: it can allow for racial, ethnic, and socio-economic profiling. *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir.2006); *United States v. Montero–Camargo*, 208 F.3d 1122, 1138 (9th Cir.2000) (en banc), *cert. denied*, 531 U.S. 889, 121 S.Ct. 211, 148 L.Ed.2d 148 (2000).