# SUPREME COURT OF THE UNITED STATES

DARIN RYBURN, ET AL. *v.* GEORGE R. HUFF, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–208.   Decided January 23, 2012

PER CURIAM.

Petitioners Darin Ryburn and Edmundo Zepeda, along with two other officers from the Burbank Police Department, responded to a call from Bellarmine-Jefferson High School in Burbank, California. When the officers arrived at the school, the principal informed them that a student, Vincent Huff, was rumored to have written a letter threatening to "shoot up" the school. App. to Pet. for Cert. 2. The principal reported that many parents, after hearing the rumor, had decided to keep their children at home. *Ibid.* The principal expressed concern for the safety of her students and requested that the officers investigate the threat. *Id.,* at 42, 54–55.

In the course of conducting interviews with the principal and two of Vincent's classmates, the officers learned that Vincent had been absent from school for two days and that he was frequently subjected to bullying. *Id.,* at 2. The officers additionally learned that one of Vincent's classmates believed that Vincent was capable of carrying out the alleged threat. *Id.,* at 44. The officers found Vincent's absences from school and his history of being subjected to bullying as cause for concern. The officers had received training on targeted school violence and were aware that these characteristics are common among perpetrators of school shootings. *Id.,* at 56–58, 63.

The officers decided to continue the investigation by interviewing Vincent. When the officers arrived at Vincent's house, Officer Zepeda knocked on the door and announced several times that the officers were with the

Burbank Police Department.  No one answered the door or otherwise responded to Officer Zepeda's knocks.  Sergeant Ryburn then called the home telephone.  The officers could hear the phone ringing inside the house, but no one answered.  *Id.,* at 2.

Sergeant Ryburn next tried calling the cell phone of Vincent's mother, Mrs. Huff.  When Mrs. Huff answered the phone, Sergeant Ryburn identified himself and inquired about her location.  Mrs. Huff informed Sergeant Ryburn that she was inside the house.  Sergeant Ryburn then inquired about Vincent's location, and Mrs. Huff informed him that Vincent was inside with her.  Sergeant Ryburn told Mrs. Huff that he and the other officers were outside and requested to speak with her, but Mrs. Huff hung up the phone.  *Id.,* at 2–3.

One or two minutes later, Mrs. Huff and Vincent walked out of the house and stood on the front steps.  Officer Zepeda advised Vincent that he and the other officers were there to discuss the threats.  Vincent, apparently aware of the rumor that was circulating at his school, responded, "I can't believe you're here for that."  *Id.,* at 3.  Sergeant Ryburn asked Mrs. Huff if they could continue the discussion inside the house, but she refused.  *Ibid.*  In Sergeant Ryburn's experience as a juvenile bureau sergeant, it was "extremely unusual" for a parent to decline an officer's request to interview a juvenile inside.  *Id.,* at 3, 73–74.  Sergeant Ryburn also found it odd that Mrs. Huff never asked the officers the reason for their visit.  *Id.,* at 73–74.

After Mrs. Huff declined Sergeant Ryburn's request to continue the discussion inside, Sergeant Ryburn asked her if there were any guns in the house.  Mrs. Huff responded by "immediately turn[ing] around and r[unning] into the house."  *Id.*, at 3.  Sergeant Ryburn, who was "scared because [he] didn't know what was in that house" and had "seen too many officers killed," entered the house behind her.  *Id.,* at 75.  Vincent entered the house behind Ser-

geant Ryburn, and Officer Zepeda entered after Vincent. Officer Zepeda was concerned about "officer safety" and did not want Sergeant Ryburn to enter the house alone. *Id.,* at 3. The two remaining officers, who had been standing out of earshot while Sergeant Ryburn and Officer Zepeda talked to Vincent and Mrs. Huff, entered the house last, on the assumption that Mrs. Huff had given Sergeant Ryburn and Officer Zepeda permission to enter. *Id.,* at 3–4.

Upon entering the house, the officers remained in the living room with Mrs. Huff and Vincent. Eventually, Vincent's father entered the room and challenged the officers' authority to be there. The officers remained inside the house for a total of 5 to 10 minutes. During that time, the officers talked to Mr. Huff and Vincent. They did not conduct any search of Mr. Huff, Mrs. Huff, or Vincent, or any of their property. The officers ultimately concluded that the rumor about Vincent was false, and they reported their conclusion to the school. *Id.,* at 4.

The Huffs brought this action against the officers under Rev. Stat. §1979, 42 U. S. C. §1983. The complaint alleges that the officers violated the Huffs' Fourth Amendment rights by entering their home without a warrant. Following a 2-day bench trial, the District Court entered judgment in favor of the officers. The District Court resolved conflicting testimony regarding Mrs. Huff's response to Sergeant Ryburn's inquiry about guns by finding that Mrs. Huff "immediately turned around and ran into the house." App. to Pet. for Cert. 3. The District Court concluded that the officers were entitled to qualified immunity because Mrs. Huff's odd behavior, combined with the information the officers gathered at the school, could have led reasonable officers to believe "that there could be weapons inside the house, and that family members or the officers themselves were in danger." *Id.,* at 6. The District Court noted that "[w]ithin a very short period of time, the officers were

confronted with facts and circumstances giving rise to
grave concern about the nature of the danger they were
confronting." *Id.,* at 6–7. With respect to this kind of
"rapidly evolving incident," the District Court explained,
courts should be especially reluctant "to fault the police for
not obtaining a warrant." *Id.,* at 7.

A divided panel of the Ninth Circuit affirmed the Dis-
trict Court as to the two officers who entered the house on
the assumption that Mrs. Huff had consented, but re-
versed as to petitioners. The majority upheld the District
Court's findings of fact, but disagreed with the District
Court's conclusion that petitioners were entitled to quali-
fied immunity. The majority acknowledged that police
officers are allowed to enter a home without a warrant if
they reasonably believe that immediate entry is necessary
to protect themselves or others from serious harm, even if
the officers lack probable cause to believe that a crime has
been or is about to be committed. *Id.,* at 24. But the
majority determined that, in this case, "any belief that
the officers or other family members were in serious, im-
minent harm would have been objectively unreasonable"
given that "[Mrs. Huff] merely asserted her right to end
her conversation with the officers and returned to her
home." *Id.,* at 25.

Judge Rawlinson dissented. She explained that "the
discrete incident that precipitated the entry in this case
was Mrs. Huff's response to the question regarding wheth-
er there were guns in the house." *Id.,* at 31. She faulted
the majority for "recit[ing] a sanitized account of this
event" that differed markedly from the District Court's
findings of fact, which the majority had conceded must be
credited. Judge Rawlinson looked to "cases that specifi-
cally address the scenario where officer safety concerns
prompted the entry" and concluded that, under the ra-
tionale articulated in those cases, "a police officer could
have reasonably believed that he was justified in making a

warrantless entry to ensure that no one inside the house had a gun after Mrs. Huff ran into the house without answering the question of whether anyone had a weapon." *Id.,* at 31, 33, 37.

Judge Rawlinson's analysis of the qualified immunity issue was correct. No decision of this Court has found a Fourth Amendment violation on facts even roughly comparable to those present in this case. On the contrary, some of our opinions may be read as pointing in the opposition direction.

In *Brigham City* v. *Stuart*, 547 U. S. 398, 400 (2006), we held that officers may enter a residence without a warrant when they have "an objectively reasonable basis for believing that an occupant is . . . imminently threatened with [serious injury]." We explained that "'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.,* at 403 (quoting *Mincey* v. *Arizona*, 437 U. S. 385, 392 (1978)). In addition, in *Georgia* v. *Randolph*, 547 U. S. 103, 118 (2006), the Court stated that "it would be silly to suggest that the police would commit a tort by entering [a residence] . . . to determine whether violence . . . is about to (or soon will) occur."

A reasonable police officer could read these decisions to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence. In this case, the District Court concluded that petitioners had such an objectively reasonable basis for reaching such a conclusion. The District Court wrote:

"[T]he officers testified that a number of factors led them to be concerned for their own safety and for the safety of other persons in the residence: the unusual behavior of the parents in not answering the door or the telephone; the fact that Mrs. Huff did not inquire

about the reason for their visit or express concern that they were investigating her son; the fact that she hung up the telephone on the officer; the fact that she refused to tell them whether there were guns in the house; and finally, the fact that she ran back into the house while being questioned. That behavior, combined with the information obtained at the school—that Vincent was a student who was a victim of bullying, who had been absent from school for two days, and who had threatened to 'shoot up' the school—led the officers to believe that there could be weapons inside the house, and that family members or the officers themselves were in danger." App. to Pet. for Cert. 6.

This belief, the District Court held, was "objectively reasonable," particularly since the situation was "rapidly evolving" and the officers had to make quick decisions. *Id.,* at 6–7.

The panel majority—far removed from the scene and with the opportunity to dissect the elements of the situation—confidently concluded that the officers really had no reason to fear for their safety or that of anyone else. As the panel majority saw things, it was irrelevant that the Huffs did not respond when the officers knocked on the door and announced their presence and when they called the home phone because the Huffs had no legal obligation to respond to a knock on the door or to answer the phone. The majority attributed no significance to the fact that, when the officers finally reached Mrs. Huff on her cell phone, she abruptly hung up in the middle of their conversation. And, according to the majority, the officers should not have been concerned by Mrs. Huff's reaction when they asked her if there were any guns in the house because Mrs. Huff "merely asserted her right to end her conversation with the officers and returned to her home."

*Id.,* at 25.

Confronted with the facts found by the District Court, reasonable officers in the position of petitioners could have come to the conclusion that there was an imminent threat to their safety and to the safety of others. The Ninth Circuit's contrary conclusion was flawed for numerous reasons.

First, although the panel majority purported to accept the findings of the District Court, it changed those findings in several key respects. As Judge Rawlinson correctly observed, "the discrete incident that precipitated the entry in this case was Mrs. Huff's response to the question regarding whether there were guns in the house." *Id.,* at 31. The District Court's finding that Mrs. Huff "immediately turned around and ran into the house" implicitly rejected Mrs. Huff's contrary testimony that she walked into the house after telling the officers that she was going to get her husband. *Id.,* at 3. The panel majority upheld the District Court's findings of fact and acknowledged that it could not reverse the District Court simply because it "may have weighed the testimony of the witnesses and other evidence in another manner." *Id.,* at 15. But the panel majority's determination that petitioners were not entitled to qualified immunity rested on an account of the facts that differed markedly from the District Court's finding. According to the panel majority, Mrs. Huff "merely asserted her right to end her conversation with the officers and returned to her home" after telling the officers "that she would go get her husband." *Id.,* at 12, 25.

Second, the panel majority appears to have taken the view that conduct cannot be regarded as a matter of concern so long as it is lawful. Accordingly, the panel majority concluded that Mrs. Huff's response to the question whether there were any guns in the house (immediately turning around and running inside) was not a reason for alarm because she was under no legal obligation to con-

tinue her conversation with the police. It should go without saying, however, that there are many circumstances in which lawful conduct may portend imminent violence.

Third, the panel majority's method of analyzing the string of events that unfolded at the Huff residence was entirely unrealistic. The majority looked at each separate event in isolation and concluded that each, in itself, did not give cause for concern. But it is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture.

Fourth, the panel majority did not heed the District Court's wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation. With the benefit of hindsight and calm deliberation, the panel majority concluded that it was unreasonable for petitioners to fear that violence was imminent. But we have instructed that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham* v. *Connor*, 490 U. S. 386, 396–397 (1989). Judged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events that culminated with Mrs. Huff turning and running into the house after refusing to answer a question about guns, petitioners' belief that entry was necessary to avoid injury to themselves or others was imminently reasonable.

In sum, reasonable police officers in petitioners' position could have come to the conclusion that the Fourth Amendment permitted them to enter the Huff residence if

Per Curiam

there was an objectively reasonable basis for fearing that violence was imminent. And a reasonable officer could have come to such a conclusion based on the facts as found by the District Court.

The petition for certiorari is granted, the judgment of the Ninth Circuit is reversed, and the case is remanded for the entry of judgment in favor of petitioners.

*It is so ordered.*