Pfeifer, J.,
dissenting.
{¶ 29} Whether this case should have been prosecuted at all is questionable. But it was. It could have been properly prosecuted. But it wasn’t. This case is before us because of the prosecution’s simple failure to meet its burden in the suppression hearing of proving that the traffic stop leading to the charge against Dunn was reasonable. The prosecution’s failure to meet its burden comes from its lack of any attempt to show that the telephone tip that led to the dispatch had sufficient indicia of reliability. This case should stand for the simple proposition that when criminal charges evolve from a traffic stop that is based entirely upon a citizen’s call to a dispatcher, the state must prove that the citizen’s call presented sufficient indicia of reliability to justify the stop.
I
{¶ 30} This is a case about a telephone tip. Officer Brazel stopped Dunn based solely on a telephone tip that Dunn was suicidal and in imminent danger. In Maumee v. Weisner, 87 Ohio St.3d 295, 720 N.E.2d 507 (1999), this court addressed whether a telephone tip can, by itself, create reasonable suspicion justifying an investigative stop. This court held that a telephone tip can, standing alone, create reasonable suspicion justifying an investigative stop where the tip has sufficient indicia of reliability: “Where an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity.” (Emphasis sic.) Weisner, at paragraph one of the syllabus.
{¶ 31} But the majority writes that “the evidentiary requirement that Weisner imposes on the state in a suppression hearing applies only to an ‘investigative stop’ authorized by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which entails seizure of a person to investigate a reasonable suspicion of criminal activity.” Majority opinion at ¶ 12. First, although it did involve an arrest for driving while intoxicated, Weisner does not limit its holding to traffic *333 stops involving suspicion of criminal behavior. Second, although the court stated in Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), that “the Fourth Amendment does not bar police officers from making warrant-less entries and searches when they reasonably believe that a person within is in need of immediate aid,” courts cannot take on faith that an emergency existed. “[A] warrantless search must be ‘strictly circumscribed by the exigencies which justify its initiation,’ Terry v. Ohio, 392 U.S., at 25-26, [88 S.Ct., at 1882, 20 L.Ed.2d 889,] and it simply cannot be contended that [the] search was justified by any emergency threatening life or limb.” Mincey at 393. That is, as with any search or seizure, a stop based upon a suspected emergency situation must be objectively reasonable based on the totality of the circumstances. At heart, Weisner is about whether a stop based solely upon a telephone tip can be objectively reasonable, and there is no reason that Weisner’s holding should not include traffic stops made for the purpose of investigating- an emergency situation.
{¶ 32} The stop of Dunn had all the earmarks of an investigative stop. In the context of an investigatory stop of an automobile, stopping a car and detaining its occupants constitutes a seizure. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Officer Brazel testified that he had turned on his overhead lights and siren to alert Dunn to pull to the side of the road. He and the township officer also responding “blocked the roadway and lit the area.” When Dunn emerged from his vehicle, Brazel told him to put his hands in the air, and he eventually handcuffed him. The video recording of the stop was labeled by the police as a traffic stop.
{¶ 33} Even if there were a requirement that a suspicion of criminal activity is necessary to gain the protection of Weisner, the evidence demonstrates that Brazel did suspect criminal activity by Dunn, i.e., the possession of a gun in his vehicle. Dunn was eventually charged with a violation of R.C. 2923.16(B), which states, “No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle.” Brazel heard a dispatch that a male driving a tow truck was planning to kill himself when he arrived at a specific residence. At the suppression hearing, he was asked whether there was any information dispatched regarding a weapon. He responded affirmatively: “Yes, advised that he was going to kill himself. But, I don’t remember if they said there was a — a firearm in the vehicle or anything like that. But, there was some indication of a weapon with the dispatch.”
{¶ 34} Brazel’s behavior at the stop indicated that he feared Dunn had a weapon. He called for backup. He approached Dunn’s vehicle with his own weapon drawn, ordering Dunn to put his hands up. He testified that he had seen *334 a cell phone in Dunn’s hand but “couldn’t see the obvious other weapons on him at that time.” He then handcuffed Dunn for the officers’ safety because he “wanted to check him for weapons.” As Brazel led him to his cruiser (“for his safety and our safety,” according to Brazel), Dunn told him, “[I]t’s in the glovebox.” Brazel had no doubt as to what Dunn was referring: “I said are you referring to the gun.” Not a. gun, the gun. Brazel knew a gun was involved.
{¶ 35} Brazel stopped Dunn because the dispatch indicated that Dunn had a weapon in his vehicle that could cause his imminent death. Dunn ended up being charged with “hav[ing] a loaded firearm in a motor vehicle in such a manner that the firearm [was] accessible to the operator or any passenger without leaving the vehicle.” The allegation in the call justifying the stop — that he possessed a weapon in his vehicle — became the very basis of the charge. Thus, even assuming arguendo that Weisner applies only to situations entailing “seizure of a person to investigate a reasonable suspicion of criminal activity,” as the majority holds at ¶ 12, the facts of this case demonstrate that there was sufficient suspicion of criminal activity in this case to trigger the protections of Weisner.
II
{¶ 36} The majority wants to make this a case only about exigent circumstances. Certainly, whether it is called the community-caretaking exception or the emergency-aid exception, there is an exception to the Fourth Amendment’s warrant requirement in cases where police are responding to emergency situations. Regarding its line of cases addressing that issue, the United States Supreme Court recently wrote, “A reasonable police officer could read these decisions to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence.” Ryburn v. Huff, 565 U.S. —, —, 132 S.Ct. 987, 990, 181 L.Ed.2d 966 (2012).
{¶ 37} Of course it is reasonable to make a traffic stop in order to prevent a suicide; but if the state brings criminal charges based upon that stop, it still must prove that the officer making the stop had a reasonable basis to believe that the driver was suicidal. Where the stop is based entirely on an informant’s call to a police dispatcher, the reasonableness of the stop must be based upon the reliability of the tip that generated the police dispatch.
{¶ 38} The majority cites many cases in which courts found that officers had a reasonable basis to conduct a warrantless entry, but none of those cases involve a telephone tip as the sole reason supporting the entry. In every case cited by the majority, the police officers in question also relied on their own observations.
*335 {¶ 39} In Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), police opened and searched the trunk of the defendant’s heavily damaged vehicle after they had had it towed to a privately owned garage. Because the searching officer knew the defendant to be an off-duty Chicago police officer and believed that Chicago police officers were required to keep their service revolver nearby at all times, he searched the trunk to retrieve the service revolver. The incriminating evidence he found — bloody clothing and other items — was not what he was originally looking for. The search of the trunk was not based upon an anonymous telephone report — it was based upon normal operating procedure and upon the officer’s belief that he was retrieving a revolver from an unguarded location.
{¶ 40} In Michigan v. Fisher, — U.S. —, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009), police responded to a disturbance call. Upon arriving at the residence in question, they saw blood on a damaged vehicle parked outside, as well as on a door of the house. They spoke to witnesses who told them the defendant was “going crazy” inside the house. Id. at —, 130 S.Ct. at 547, 175 L.Ed.2d 410. Through a window, the officers could see the defendant, Jeremy Fisher, inside the house, screaming and throwing things. The back door was locked, and a couch had been placed to block the front door. The police entered the home, and the defendant pointed a rifle at one of the officers. Fisher was later charged with crimes related to the firearm. Again, police had entered the home based in part upon the officers’ own observations.
{¶ 41} Likewise, in Brigham City v. Stuart, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), police entered a home only after they had seen — through a window — a fight break out inside. After entering the house, they made arrests for intoxication and contributing to the delinquency of a minor.
{¶ 42} In State v. Applegate, 68 Ohio St.3d 348, 626 N.E.2d 942 (1994), police entered a residence after they had personally heard sounds coming from inside the house indicative of violence. When the defendant refused to put down a whiskey bottle, a scuffle ensued. The defendant was arrested for disorderly conduct, and while he was being searched, a baggie of cocaine was found in his pocket.
{¶ 43} In cases cited by the majority involving threatened suicide, the warrant-less entries also came as the result of personal observations by the officers involved. In Turner v. State, 645 So.2d 444 (Fla.1994), officers made warrantless entry into a hotel room when they saw the defendant holding a gun to his head. They then encountered evidence of murders that the defendant had committed.
{¶ 44} In Seibert v. State, 923 So.2d 460, 470-471 (Fla.2006), police responded to a 9-1-1 call regarding a suicidal person. The call had come from the person’s roommate. When they arrived at the residence, police spoke to the roommate *336 who had placed the 9-1-1 call and were told that the defendant was inside the residence and was suicidal. They entered the defendant’s residence after he cracked open the door, and while inside, they spotted a severed foot.
{¶ 45} In United States v. Uscangar-Ramirez, 475 F.3d 1024 (8th Cir.2007), the defendant’s wife consented to the police officers’ entry into the residence, and she told them that her husband was armed and despondent.
{¶ 46} In all the above cases relied upon by the majority, at least some of the facts justifying the officers’ warrantless entry into the defendant’s property were gleaned from the officers’ own investigation. Thus, the present case differs from all the cased cited by the majority. Officer Brazel’s stop was not based on any personal observation. It was based only upon a police dispatch. And a dispatch alone can form a reasonable basis for a valid stop only when there is some evidence of the reliability of the information given to the dispatcher.
Ill
{¶ 47} A determination of the reasonableness of a stop under Weisner “involves a consideration of ‘the totality of the circumstances.’ United States v. Cortez (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628-629. Under this analysis, ‘both the content of information possessed by police and its degree of reliability’ are relevant to the court’s determination. Alabama v. White (1990), 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309.” Weisner, 87 Ohio St.3d at 299, 720 N.E.2d 507.
{¶ 48} Where the only information possessed by police prior to the stop is from an informant’s tip, “the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip,” specifically, “whether the tip itself has sufficient indicia of reliability to justify the investigative stop.” Id. The most important factors in determining the reliability of an informant’s report are “the informant’s veracity, reliability, and basis of knowledge.” Id., citing White at 328.
{¶ 49} In Weisner, this court did not set a high bar on the type of evidence needed to prove that a call to a dispatcher presents sufficient indicia of reliability to justify a traffic stop. The state “must present evidence of the facts known to the dispatcher in these situations.” Weisner at 298. The testimony of the informant who made the call is not required. The testimony of the dispatcher is not required. In Weisner, this court held that testimony from the arresting officer about the facts that precipitated the dispatch as relayed to him by the dispatcher was sufficient. This court was even willing to allow that testimony as *337 support even though the dispatcher might not have told the officer all the facts that precipitated the dispatch until after the stop was completed. Id. at fn. 1.
Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram and Timothy J. Cole, Assistant Prosecuting Attorneys, for appellant.
Gary C. Schaengold, for appellee.
Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, and Thaddeus H. Driscoll, Assistant Attorney General, urging reversal on behalf of amicus curiae Ohio Attorney General.
Timothy Young, Public Defender, and Jeremy J. Masters, Assistant Public Defender, urging affirmance on behalf of amicus curiae Ohio Public Defender.
{¶ 50} Here, the state introduced no evidence regarding the facts known to the dispatcher regarding the caller. There was no way, then, for the trial court to judge the reliability of the information the caller gave to the dispatcher. Thus, the state failed to prove that the stop leading to Dunn’s indictment was reasonable.
IV
{¶ 51} Great police work does not have to result in a conviction. Whether they are assisting stranded motorists, helping lost children find their parents, or calming potentially dangerous situations, police officers serve their communities daily performing good deeds that do not show up on police blotters. In this case, Officer Brazel did exemplary work. He interrupted Dunn’s potential suicide. He defused the situation with no injury to himself or Dunn. He did not arrest Dunn; instead, he took him to a local hospital to get him the mental-health help he needed. Why did Brazel drive Dunn himself? Because Dunn was upset over having been billed for an earlier trip to the hospital by ambulance. This was a mission of mercy performed with impeccable professionalism by a well-trained police officer.
{¶ 52} But the prosecutor decided to charge Dunn with a crime, and we therefore must consider whether the state properly proved the case against him. At the suppression hearing, the state failed to prove the reliability of its informant’s tip in a situation where the informant’s tip served as the entire basis for the stop leading to Dunn’s indictment. The court of appeals was therefore correct in reversing the conviction. Accordingly, I dissent.