FRIEDLAND, Circuit Judge,
with whom THOMAS, Chief Judge, joins, concurring in part and dissenting in part:
I join the majority’s opinion as to municipal liability but dissent from its affir-mance of summary judgment on the claim against the individual defendants. An official is liable, and not entitled to qualified immunity, if her “conduct violated a clearly established constitutional right.” Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The constitutional rule that B.W. could not be seized without a warrant absent imminent danger was clearly established, and it was equally clear that there was no imminent danger to B.W. On the Fourth Amendment claim against the social workers, I would therefore hold that summary judgment to Defendants should be reversed and Plaintiffs cross-motion for summary judgment should be granted.[1]
*799 The majority correctly recognizes that the rule of law at issue here was clearly established at the time: “[A] child could not be removed without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury.” Maj. Op. at 792 (citing Rogers v. Cty. of San Joaquin, 487 F.3d 1288, 1297 (9th Cir. 2007)); see also Mate v. San Bernardino Cty., Dep’t of Pub. Soc. Servs., 237 F.3d 1101, 1106 (9th Cir. 2001) (“Government officials are required to obtain prior judicial authorization before intruding on a parent’s custody of her child unless they possess information at the time of the seizure that establishes ‘reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.’” (quoting Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000))). Nevertheless, the majority holds that the social workers are entitled to qualified immunity because it was debatable whether B.W. was in imminent danger. I disagree.
The only conclusion to be drawn from the very record evidence the majority discusses is that no reasonable social worker could have believed B.W. was in imminent danger of serious bodily injury. See Saucier v. Katz, 533 U.S. 194, 207, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (“Fourth Amendment issues [] are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.”). As the majority correctly points out, Whitworth’s methamphetamine abuse could not have reasonably posed a threat to B.W. while both were in the hospital because, even though hospital staff noted that Whitworth was apparently not taking adequate care of B.W., nurses were attending to the newborn’s needs. Maj. Op. at 791-92.[2] Nor was there any reasonable risk that Whitworth would abscond with B.W. In the majority’s own words, “Whitworth was recovering from a cesarean section, and had demonstrated no prior resistance to the social workers’ intervention!;:] ... [S]he remained in the hospital’at the time of the protective custody hearing the day after B.W.’s removal [, and] the hospital [had] also put a hold on B.W.” Maj. Op. at 791-92. “Accordingly,” the majority correctly concludes, there was only an “unlikely possibility that Whit-worth might unexpectedly abscond with B.W.” Id. at 792. “So remote a risk does not establish reasonable cause to believe that the child[] [was] in immediate danger.” Rogers, 487 F.3d at 1295.
Indeed, as the majority correctly recognizes, the social workers expressly admitted that they did not believe B.W. was in imminent danger at the time they seized her. See Maj. Op. at 791-92 (describing Defendant Kennedy’s testimony that the hospital’s maternity ward is a safe environment and Defendant Wilcox’s testimony that there was no danger to B.W. while the hospital’s hold was in place). I am aware of no contrary testimony that would' create a triable issue as to whether B.W. was in imminent danger. On this record, it is thus clear that B.W. was not in imminent danger. The social workers, therefore violated B.W.’s clearly established rights in failing to obtain a warrant before seizing her.
Although it is true that no binding authority has addressed this exact factual *800 scenario, such specificity is not required for a constitutional obligation to be “clearly established.” See Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (stating that for a constitutional right to be clearly established, the “very action in question” need not have “previously been held unlawful,” as long as “in the light of pre-existing law the unlawfulness [is] apparent” (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))). It was clearly established that a child could not be seized without a warrant absent imminent danger, and the inescapable conclusion to be drawn from this record is that no objective social worker could have believed— and indeed, these social workers did -not believe — that B.W. was in imminent danger. It follows, therefore, that the social workers violated B.W.’s clearly established constitutional rights.
In my view, qualified immunity should be denied and summary judgment entered for Plaintiff on the' Fourth Amendment claim. I dissent from the majority’s contrary conclusion.
KOZINSKI, Circuit Judge,
with whom Circuit Judges O’SCANNLAIN, RAWLINSON and BEA join, and Circuit Judge WATFORD joins with respect to Part 2, dissenting in part:
For the reasons explained in my panel dissent, ’ I agree that the social workers here are entitled to qualified immunity and join that part of the opinion. But I cannot agree that the social workers committed a constitutional violation, nor that the County can be liable for a policy of unconstitutional conduct under Monell. I therefore dissent from those portions of the opinion.
1. There Was No Constitutional Violation
The majority acknowledges that Whit-worth was a drug addict who used meth throughout her pregnancy — transferring it to her baby — and had no job or stable living situation. Op. at 786-87, 791. And my colleagues recognize that “B.W.’s age may have rendered her more vulnerable to the harms of neglect if it were to occur.” Id. at 791-92. They even quote Kennedy testifying that B.W. “could die if she goes home with a mother who’s high on drugs and forgets to feed her.” Id. at 792.
The majority dismisses this exigency because Whitworth remained in the hospital recovering from her c-section “and had demonstrated no resistance to the social workers’ intervention: Whitworth even volunteered her case worker’s contact information to hospital staff.” Id. I disagree with both prongs of the majority’s reasoning.
That Whitworth was recovering from surgery certainly doesn’t mean she couldn’t leave the' hospital on short notice. The social workers here testified that moms like Whitworth “don’t always stay for a few days at the hospital, sometimes they just leave” even after a c-section, as Judge Christen notes. See Christen, J., concurring, at 798. It may have been foolish for Whitworth to do so, but someone who abuses her body and baby by using meth throughout her pregnancy can hardly be counted on to calculate danger rationally or avoid putting herself and her baby at risk.
We may evaluate the risks differently with the benefit of hindsight, but that is not the test. The test is whether well-informed social workers on the scene could reasonably believe that leaving the baby in the mother’s control while they sought a warrant would put the baby at some risk of serious bodily injury or death. See Ryburn v. Huff, 565 U.S. 469, 132 S.Ct. 987, 992, 181 L.Ed.2d 966 (2012) (per curiam); Ashcroft v. al-Kidd, 563 U.S. 731, 735-36, *801 743-44, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). I don’t read the majority as saying that there was no risk of harm to the baby, only that the risk was small. As Judge Christen aptly notes, “the social workers reasonably refused to gamble that Whit-worth would make the sound decision to leave B.W. in the hospital.” Christen, J., concurring, at 798. We are not entitled to second-guess that judgment.
That the mother was cooperative was no guarantee that she wouldn’t change her mind. Meth addicts can be volatile. Because “it only takes minutes to walk out of a hospital,” id. at 798, and put a baby’s life in danger, any time the social workers took to get a warrant would be too much. My colleagues in the majority are willing to risk a baby’s life on the presumed rational behavior of a woman who treats her own health and that of her baby with contempt. I can’t agree that the social workers were unreasonable in taking a different view. Indeed, they reasonably could have taken the mother’s cooperation as consent, which also would have obviated the need for a warrant.
The test under the Fourth Amendment is reasonableness. The Supreme Court has “instructed that reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Ryburn, 132 S.Ct. at 992 (internal quotation marks and citation omitted). “Judged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding, chain of events,” id., the social workers here acted reasonably in the difficult circumstances presented to them. Had they left to get a warrant, and had the mother departed the hospital with the baby, they would have had the baby’s life on their conscience. I cannot blame them for refusing to take that small — but far from trivial — risk.
2. The County Is Not Liable Under Monell
The majority compounds its error by holding that the County can be liable for B.W.’s supposedly unconstitutional removal: “Summary judgment on B.W.’s Fourth Amendment claim against Washoe County is still inappropriate if we can trace the social workers’ unconstitutional-removal to a systemic failure -to-train' DSS officers to obtain a warrant before seizing a child to investigate abuse or neglect.” Op. at 793. But the majority never points to any evidence of a systemic problem. The only evidence we have is the experience of the two social workers who were named as defendants in this case. There is no evidence that the training these social workers received was typical. The plaintiffs presented no evidence at all as to the training and guidance given to the rest of the County’s social workers, or even how many of them there were. The experience of these two individuals could be atypical; two data points aren’t enough to establish a pattern or policy.
The majority frames this case as one where the unconstitutional consequences of failing to train were so “obvious” that the violation of a right was “highly predictable.” Id. at 794 (quoting Connick v. Thompson, 563 U.S. 51, 64, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)); see also id. at 796-97. But the social workers testified that the County trained them on the law and instructed them to remove a child only if there were an imminent risk of harm. So there was training and' there was a standard: “imminent risk to the well being of that child” or “imminent danger.” According to the evidence, this meant “a child’s life was in danger”; that a “child would suffer a serious injury or even possibly death if something wasn’t done.” That’s the constitutional standard: If there are *802 exigent circumstances, no warrant is required. It’s not “highly predictable” that the County’s training would lead to unconstitutional results.
The majority recognizes that “[t]he lack of a formal policy is not necessarily unconstitutional if DSS removes children only in cases in which the removal is justified by exigent circumstances.” Id. at 796. The majority gets around that conclusion by finding “it was social workers’ regular practice to remove children regardless of the risk of imminent bodily harm.” Id. As is often the case with appellate fact-finding, this is a figment.
The majority points to no evidence of a “regular practice” or even a single other instance of children being removed when there was no imminent risk of harm. Instead, they rely on Wilcox’s testimony that “she was trained on ‘imminent’ danger,” but couldn’t remember the specifics of that training at a deposition three years later. Id. at 794-96, 796 n.3. So what? The County is hardly at fault because employees are unable to give details of their training sessions years later. The majority also uses a deposition hypothetical — whether Wilcox would get a warrant to remove a child who will return in four days to a molesting father — as proof that the County’s training was insufficient because it didn’t teach the social workers to get a warrant. Id. The hypothetical is totally inapposite here, where even a few minutes would be enough for Whitworth to leave the hospital with B.W. and put her life at risk. See supra p. 800-01. The County cannot be held liable under Monell based on what an employee says she would have done in a non-analogous, hypothetical situation.
But even if the majority’s illusory finding were supported by the record, it wouldn’t be enough. “A pattern of similar constitutional violations by untrained employees is ‘ordinarily necessary’ to demonstrate deliberate indifference for purposes of failure to train.” Connick, 563 U.S. at 62, 131 S.Ct. 1350 (emphasis added) (citation omitted). Here, there is no evidence that the County unconstitutionally removed any other child because it failed to train social workers on how to get warrants. The majority derives a pattern from a single data point.
[[Image here]]
The majority gets it almost right. I dissent because, when life or death are concerned, “almost right” isn’t.

. Plaintiff filed a cross-motion for summary judgment and has argued on appeal that it should have been granted.

. Whitworth's unemployment and lack of stable housing could not justify the warrantless seizure because, again as the majority aptly states, "[rjeliance on factors so closely related to economic status as a justification for removal would border on the unconstitutional.” Maj. Op. at 791 (quoting Rogers, 487 F.3d at 1296). Nor did Whitworth's unemployment and a lack of stable housing pose an imminent danger to B.W. while both were in the hospital.