THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,    )    No. 80277-1-I
                            )
            Respondent,     )    DIVISION ONE
                            )
        v.                  )    UNPUBLISHED OPINION
                            )
SARAH ADAMS,                )
                            )
            Appellant.      )
_____)

ANDRUS, A.C.J. — Sarah Adams appeals her jury conviction for vehicular homicide and possession of heroin. She challenges the trial court's denial of her pretrial motions to suppress evidence and sever the charges. She also argues the trial court failed to properly instruct the jury on an essential element of the possession charge. We conclude that the trial court did not err in denying Adams's motions to suppress evidence and to sever the charges. We reverse her conviction for possession of heroin based on State v. Blake, No. 96873-0, slip op. (Wash. Feb. 25, 2021), https://www.courts.wa.gov/opinions/pdf/968730.pdf.

FACTS

Sarah Adams was charged with vehicular homicide and possession of heroin after she struck and killed a motorcyclist, Jonathan Wiger, who was stopped at a traffic light on his way home from work at approximately 5:30 pm on June 19,

Citations and pin cites are based on the Westlaw online version of the cited material.

2017. As Wiger and several other motorists waited for the light to change at the intersection of 15th Street NW and State Route 167 in Auburn, Washington, Adams approached from behind traveling approximately 40 miles per hour. The weather was sunny and dry, yet Adams made no attempt to stop or slow down as she neared the intersection. Adams slammed into the rear of Wiger's motorcycle with her Subaru Outback and threw him forty-five feet into another vehicle. Wiger died at the scene shortly after the collision. His motorcycle also struck other vehicles waiting at the intersection, causing at least one other injury.

Adams's Subaru was severely damaged and came to rest on its side, trapping Adams inside and scattering used syringes and drug paraphernalia across the pavement. Responding firefighters broke out the rear window of her car to allow her to climb out, but refused to enter Adams's vehicle to extract her because of the presence of needles.

Police Officer Aaron Scrivo was dispatched to the scene at approximately 5:34 pm. He saw what appeared to be a very severe, multiple car accident involving a high-speed collision resulting in at least one fatality. The accident scene was a large intersection with at least four lanes of traffic, one turning lane, and highway entrance and exit ramps. One vehicle was on its side and multiple cars were strewn between lanes, some having rolled into others. He began assisting other officers talking to witnesses to determine what had happened.

Sergeant James Hopper, the supervisor on this scene, arrived at 5:47 pm. By the time he arrived, Adams was in an ambulance and being evaluated by emergency personnel. Sergeant Hopper began his investigation to determine the cause of the accident. He saw needles on the ground around the Subaru, one of

- 2 -

which was uncapped with a substance inside. He believed it may have been what drug users call "call loading," where the user draws blood into a syringe and mixes it with heroin for injection at a later time. The syringe's plunger was depressed and appeared to have been mostly used. He also observed a bottle of hydrocodone inside the Subaru.

In inspecting the accident site itself, Hopper found the Subaru's front bumper caught between the motorcycle's front and rear wheels and no evidence of any skid marks, suggesting the Subaru's driver had not braked before impacting the motorcycle. By 6:18 pm, Sergeant Hopper believed he had probable cause to arrest Adams for committing vehicular homicide. He believed at that point that there was sufficient evidence to establish Adams was under the influence of heroin and caused the accident, leading to Wiger's death.

Sergeant Hopper learned the paramedics were preparing to transport Adams to the hospital for medical treatment. He ordered Officer Scrivo to follow the ambulance to the hospital to place her under arrest and conduct a warrantless blood draw. Sergeant Hopper decided he needed to remain at the scene to ensure the scene was safe for police to work in, that traffic was under control, that everyone injured received appropriate medical care, and that sufficient investigative personnel were present to interview witnesses, collect evidence, and take photographs of the scene.

Officer Scrivo spoke to the paramedics before they left to confirm they would not give Adams anything intravenously while en route to the hospital. Officer Scrivo left the scene at the same time as the ambulance at 6:19 pm, and they both arrived at the hospital at 6:24 pm. He immediately placed her under arrest and

advised her of her legal rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

Officer Scrivo overheard Adams complain of pain to the emergency room staff. Given the severity of the collision and the condition and location of Adams's car, he believed her complaints of pain to be reasonable. The treatment team was preparing to conduct their typical blood draws and, based on his experience, expected Adams to be ordered to undergo X rays and a CT scan. When Adams asked for some pain medication, he became concerned that this treatment would affect the evidentiary value of any blood. He ordered a blood draw without obtaining a search warrant because he did not believe he had the ability to delay her medical treatment to do so. The phlebotomist conducted the blood draw at 7:07 pm.

Sergeant Hopper testified he had authorized the warrantless blood draw in this case because of time and personnel constraints. First, he knew Adams was being taken by ambulance to a hospital for treatment. He believed, given the circumstances, it was highly likely that Adams's blood was "imminently" going to be altered by the medical providers and was concerned the introduction of saline or drugs into her blood would destroy evidence of vehicular homicide. Second, Sergeant Hopper also had personnel constraints. He was the supervisor on scene and he was occupied directing officers in controlling the scene and conducting the investigation. Officers on scene did not have laptops they could use to prepare a search warrant request and Sergeant Hopper would have had to leave the investigation scene to return to the police station to begin that process. Although he could have returned to the station to prepare a search warrant request,

Sergeant Hopper testified it would have taken him one to two hours to complete the paperwork, locate a prosecutor to review the search warrant, and then find a judicial officer to consider the request. He concluded he could not obtain a search warrant before Adams arrived at the hospital and began receiving treatment.

Officer Scrivo similarly testified that in the best case scenario, he could have obtained a search warrant for Adams's blood within 40 minutes to an hour. But because Adams was not in the physical shape to be arrested as in "a typical DUI arrest" and transported to a hospital for a blood draw after obtaining a search warrant, but was instead being transported to the hospital for medical treatment and going to start receiving help she needed immediately, he too felt he could not delay.

Adams's blood sample tested positive for high levels of methamphetamines. In the meantime, officers searching the scene found Adam's purse that had fallen out of her car when it flipped. Police subsequently obtained a search warrant for the purse and found a wallet, inside of which was a baggie containing a black substance, later confirmed to be 2.9 grams of black tar heroin.

The State charged Adams with vehicular homicide for operating a vehicle in a reckless manner in violation of RCW 46.61.520(1)(a), or operating a vehicle while under the influence of drugs in violation of RCW 46.61.520(1)(b), and causing Wiger's death. It also charged Adams with possession of heroin in violation of RCW 69.50.4013.

Adams moved to suppress the results of the blood draw. After hearing testimony from Sergeant Hopper, Officer Scrivo, and the phlebotomist, Marya Wargacki, the trial court denied this motion. The court found the State had proved

the warrantless blood draw was permissible under the exigency exception of the warrant requirement:

> The scene of the collision was both confusing and chaotic. Someone was dead; Officers needed to ensure other people at the scene were safe, direct rush-hour traffic, secure the scene to preserve evidence, interview witnesses, and review physical evidence. Officers needed time to properly investigate. . . . Officers did not determine that she likely met the elements of vehicular homicide, that is: she was driving, caused the collision, and was likely either reckless or under the influence, until shortly before she left for the hospital at 6:19PM.
>
> Once Adams was taken for treatment, Officers no longer had control over her. Further, they had no authority to order denial of treatment while they processed a warrant application. So, it was a legitimate concern that medical personnel may treat Adams with medication that would taint any evidentiary value of a blood draw.
>
> Although with hindsight, it may have been possible for the Officer to obtain a warrant prior to the blood draw, this is not the standard for how we consider Officers' actions. The blood draw was completed by 7:07PM, roughly 1.5 hours from the call reporting the accident. Given the officers [sic] self-reported time of 1-2 hours, it may have technically been possible to secure a warrant prior to the blood draw. However, when looking at what officers knew at the time, it was reasonable that they determined an exigent blood draw was necessary. They did not determine probable cause to arrest until shortly before Adams was taken to the hospital at 6:19PM. The blood draw occurred within an hour of her being taken to the hospital. Additionally, this was delayed do [sic] to the difficulty of the blood draw. Given the severity of the case, the time required for the warrant, the natural dissipation of drugs in the blood, the fear that medication would destroy the evidentiary value of the blood, and the lack of control over Adams while she was in the care of medical providers, it was reasonable that Officers determined there was an exigency justifying a warrantless blood draw.

Adams also moved to sever the vehicular homicide charge from the heroin possession charge. The trial court denied this motion as well. Adams did not renew her severance motion at the close of evidence and did not object to any of the State's proposed jury instructions. The jury found Adams guilty of both charges and the trial court imposed a sentence of 114 months.

Adams appeals the warrantless blood draw, the failure to sever the two charges, and the sufficiency of the drug possession jury instructions.

ANALYSIS

A.     Motion to Suppress

Adams argues the trial court erred when it denied her motion to suppress the results of her warrantless blood draw. We agree with the trial court that exigent circumstances justified the warrantless seizure under the circumstances the officers confronted in this case.

We review a trial court's legal conclusions on a motion to suppress evidence de novo. State v. Baird, 187 Wn.2d 210, 218, 386 P.3d 239 (2016). Whether exigent circumstances existed to justify a warrantless blood draw is a legal question we review de novo. City of Seattle v. Pearson, 192 Wn. App. 802, 811-12, 369 P.3d 194 (2016).

Generally, warrantless searches and seizures are presumed to violate the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Drawing a person's blood for drug or alcohol testing is a search triggering these constitutional protections. Pearson, 192 Wn. App. at 811. A warrantless search is permissible, however, if exigent circumstances exist. Baird, 187 Wn.2d at 218. The exigent circumstances exception to the warrant requirement applies where obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape, or permit the destruction of evidence. State v. Tibbles, 169 Wn.2d 364, 370, 236 P.3d 885 (2010).

The natural dissipation of an intoxicating substance in a suspect's blood may be a factor in determining whether exigent circumstances exist, but courts must look to the totality of the circumstances on a case-by-case basis. Id. And we judge the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Missouri v. McNeely, 569 U.S. 141, 158, n. 7, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013) (quoting Ryburn v. Huff, 565 U.S. 469, 477, 132 S. Ct. 987, 181 L. Ed. 2d 966 (2012)). The State bears the burden of demonstrating that exigent circumstances justified a warrantless search by clear and convincing evidence. Baird, 187 Wn.2d at 218; Pearson, 192 Wn. App. at 811.

Adams first contends the State failed to meet its burden of showing the existence of exigent circumstances because no medical personnel informed the police that they intended to introduce any medicine or fluids into her bloodstream before the draw. But even without such direct evidence, the totality of the circumstances supports the conclusion that there was a significant likelihood that Adams's blood chemistry would be altered by medical treatment and a significant risk that evidence of her drug use at the time of the accident would be compromised.

First, Adams had been in a serious car accident in which her car flipped up onto its side. She was evaluated by paramedics at the scene and they determined she needed to be taken to the hospital for treatment. Second, when she arrived at the hospital, she complained of pain and requested pain medication. The testifying officers stated their experience in similar situations led them to believe she would receive some type of opiate for pain. Sergeant Hopper believed there

was evidence that Adams had used heroin, an opiate. He was reasonably concerned that administering an opiate to Adams in the hospital would affect law enforcement's ability to determine the level of opiates in her system before receiving such pain medications.

Third, neither Sergeant Hopper nor Officer Scrivo felt it would be appropriate for law enforcement to interfere with Adams's emergency medical treatment. This decision, viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," was a rational one here. As the trial court pointed out, the officers had no control over the treatment physicians might deem necessary for Adams or the authority to order the treatment providers to delay treatment to allow them to obtain a warrant. Their conclusion that evidence would be destroyed if they did not immediately conduct a blood draw appeared factually well founded, whether or not hospital staff informed the officers that Adams needed imminent medical treatment that would alter her blood chemistry.

Adams next contends the State did not meet its burden of proof because, by the officers' own estimate, there was enough time between when they arrived at the scene and when the blood draw occurred to secure a warrant. On this basis, Adams seeks to distinguish this case from Division Two's decision in State v. Inman, 2 Wn. App. 2d 281, 409 P.3d 1138 (2018). In Inman, two people were injured in a motorcycle accident on a rural road. Inman, the driver of the motorcycle, had been briefly knocked unconscious and had sustained serious injuries to his face. Id. at 284. When police arrived, Inman admitted that he had been drinking before the accident. Id. at 285. Because a helicopter was coming

to medevac Inman and the accident occurred in a rural area without reliable cell phone coverage, the responding officers concluded that they did not have the estimated forty-five minutes to obtain a warrant for a blood draw. Id. Division Two concluded that exigent circumstances supported the warrantless blood draw in that case. Id. at 293.

Adams correctly points out that Inman is distinguishable from the present case, the primary difference being the police in Inman lacked reliable cell coverage to contact a prosecutor in the time before he was flown to a hospital. But the similarities between Inman and this case are more significant than the differences. Both defendants were injured in the accident. Id. at 292. Both required and received emergency medical treatment. And in both cases, the police officers could not obtain a search warrant before the defendants were removed from law enforcement's control by those providing that care. Finally, both cases involved the risk that the medical treatment could impact the evidentiary value of the blood sample. Id. at 292.

Adams asks this court to overturn her conviction based on Pearson. But Pearson is not controlling here. In that case, Pearson, who pulled over and called police after she struck a pedestrian with her car, was subjected to a warrantless blood draw and then charged with driving under the influence after her blood sample tested positive for THC. Id. at 807-809. This court held the City had not met its burden of demonstrating exigent circumstances existed because the only justification for failing to obtain a warrant was the concern that the passage of time would lead to the natural dissipation of THC in Pearson's bloodstream. Id. at 816.

The City failed to present any evidence indicating why they did not obtain a warrant. Id. at 815.

Here, on the other hand, the State's offered justification for the warrantless blood draw goes well beyond the concern that intoxicants in Adams's bloodstream would naturally dissipate while they sought a search warrant. Pearson was uninjured while Adams needed emergency medical care. Police officers put Pearson through field sobriety tests at the scene. Id. at 807-08. Officers could not undertake such tests in this case. The Pearson case did not involve a deceased victim in the middle of a busy intersection at rush hour, with multiple damaged vehicles and at least one other injured victim. Pearson did not need to be transported to the hospital via ambulance, whereas Adams did. The most crucial distinction was the reasonable probability that Adams's medical care would imminently alter the composition of her blood, thus destroying evidence.

Adams argues that the warrantless blood draw took place forty minutes after the police established probable cause, reasonably within the estimated time frame it would have taken law enforcement to obtain a warrant. But the trial court correctly concluded this argument ignores the situation these officers confronted by this chaotic and confusing crime scene and the unknowns regarding Adams's physical condition. Sergeant Hopper testified he lacked both the time and the personnel to address every issue simultaneously and, with medical treatment imminent, he did not have the time or the ability to obtain a search warrant without having to force Adams to delay what may have been necessary medical treatment. These situational restraints, in addition to the lingering risk that Adams's medical

treatment would contaminate the evidence provided by her blood sample, made it impractical for the officers to obtain a warrant for a blood draw.

We conclude the State established the existence of exigent circumstances by clear and convincing evidence.

B.    Motion to Sever Charges

Adams next argues the trial court erred when it denied her motion to sever the vehicular homicide charge from the possession of a controlled substance charge.  Adams failed to preserve this issue for appeal.

We review a trial court's denial of a motion to sever charges for abuse of discretion.  State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).  Severance is governed by CrR 4.4, which provides in part,

> [t]he court, on application of the prosecuting attorney, or on application of the defendant pursuant to subsection (a), shall grant a severance of offenses whenever before trial or during trial with consent of the defendant, the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense.

CrR 4.4(b).  Subsection (a) provides that

> [a] defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require. . . . If a defendant's pretrial motion for severance was overruled he may renew the motion on the same ground before or at the close of all the evidence. Severance is waived by failure to renew the motion.

(Emphasis added).

In this case, Adams moved for severance before trial but failed to renew the motion at the close of the evidence.  She therefore waived severance and the issue

is not before us on appeal. State v. Bluford, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017).

C.      Possession of Controlled Substance Jury Instruction

Finally, Adams argues the trial court erred by failing to instruct the jury that the crime of possession of a controlled substance includes an element of knowledge. She contends RCW 69.50.4013(1), the possession statute, must either be interpreted to require knowledge or be declared unconstitutional. In light of the Supreme Court's recent decision in State v. Blake, No. 96873-0, slip op. (Wash. Feb. 25, 2021), https://www.courts.wa.gov/opinions/pdf/968730.pdf, we agree.

The State first contends that Adams is precluded from raising this issue for the first time on appeal under the invited error doctrine because she did not object to the to convict instructions at trial. This argument lacks merit.

Under the invited error doctrine, a defendant may not challenge for the first time on appeal, jury instructions which she proposed. State v. Henderson, 114 Wn.2d 867, 868, 792 P.2d 514 (1990). However, the doctrine does not preclude defendants from challenging on appeal jury instructions the defendant did not propose. State v. Thomas, 150 Wn.2d 821, 844, 83 P.3d 970 (2004). The State offers no authority for its contention that a defendant's failure to object to jury instructions proposed by the prosecution constitutes invited error. The doctrine therefore does not preclude Adams from raising the issue here.

The State argues that possession of a controlled substance is a strict liability crime and that the lack of a mens rea does not render RCW 69.50.4013(1) unconstitutional, citing State v. Bradshaw, 152 Wn.2d 528, 539-40, 98 P.3d 1190

(2004), and State v. Cleppe, 96 Wn.2d 373, 380, 635 P.2d 435 (1981). But the Supreme Court's majority opinion in Blake indicates the constitutional issue was not addressed on its merits in either Bradshaw or Cleppe. Blake, slip op. at 6, n. 4. It went on to hold that the absence of a mens rea element in RCW 69.50.4013(1) for the crime of possession of a controlled substance violates due process and renders the statute void. Blake, slip op. at 31. Because the statute is void, we vacate Adams's conviction for possession of a controlled substance.

Affirmed in part; reversed in part.

Andrus, A.C.J.

WE CONCUR:

Mann, C.J.

Chun, J.